[No. B081043. Second Dist., Div. Seven. May 22, 1995.]

ALPHA DONCHIN, Plaintiff and Appellant, v.
UBALDO ANTONIO GUERRERO et al., Defendants and Respondents.

COUNSEL

Capiro and Associates and Rafael M. Capiro for Plaintiff and Appellant.

Anderson, McPharlin & Connors and Jane E. Randolph for Defendants and Respondents.

## OPINION

JOHNSON, J.—In this dog attack case we conclude the injured plaintiff raised a triable issue whether defendant landlord knew about the vicious propensities of his tenant's two rottweilers. The landlord filed a declaration denying he possessed this knowledge. We hold plaintiff introduced sufficient evidence casting doubt on the landlord's credibility to create a triable issue whether he did know the dogs were dangerous. Consequently, we reverse the trial court's grant of summary judgment in the landlord's favor.

### FACTS AND PROCEEDINGS BELOW

According to the allegations of the complaint and evidence before the trial court on summary judgment motion, Alpha Donchin took her dog for a walk on January 28, 1991, between the hours of 7 a.m. and 7:30 a.m. While approximately three-quarters of a block from her house, Ms. Donchin and her small shihtzu dog were attacked by Ubaldo Antonio Guerrero's two rottweilers. At first the rottweilers went for the small, 14-pound dog. But when Ms. Donchin intervened by lifting her dog to safety, the rottweilers attacked her, too. The rottweilers continued to attack Ms. Donchin even after she put her dog back down. As a result of this incident, Ms. Donchin suffered a broken hip and other injuries.

Codefendant Guerrero owned the rottweilers, while codefendant David Swift (now deceased) owned the property at 3922 Big Oak Drive, Studio City, California, where Guerrero and the dogs resided. The attack on Ms. Donchin occurred approximately four blocks away from Swift's property.

Although Swift initially denied knowing the two rottweilers were staying on his property, by the time of the summary judgment motion it was uncontested Swift knew of the dogs' existence. This is evidenced both from the initial rental agreement and from monthly visits Swift made to the property when collecting rent. According to declarations from Swift and Guerrero, Swift never knew of the dogs' vicious propensities. Swift even stated he would play with the dogs during his visits to the property. Moreover, Guerrero stated in his deposition the dogs never bit or attacked his roommate's three-year-old child. Finally, Guerrero claimed he never observed the dogs ever behave viciously when he took them on their daily walks.

Ms. Donchin, however, claims Swift was indeed aware of the dogs' viciousness. Ms. Donchin substantiated her claim with declarations from several individuals, including a neighbor, a parcel carrier and a canine expert.

Robert Kaylor, a neighbor, declared he knew of the dogs' viciousness. According to Kaylor, the dogs frequently ran loose around the neighborhood, lunging towards both people and other dogs. Kaylor stated he was so afraid of the dogs he kept a baseball bat outside his back door as a safety measure.

Scott Schreiner, a United Parcel Service (UPS) employee, declared he avoided entering Guerrero's yard to deliver packages because of the rottweilers' threatening behavior toward him. Instead he would toss the packages over the fence into the yard because he feared the two rottweilers.

In her declaration, Renae McCarthy, a paralegal working for Donchin's attorney, testified Swift called her office regarding his receipt of the summons and complaint in the instant case. He told McCarthy he did not know there were dogs of any kind living on his property. He further stated he had never authorized his tenant to have dogs on the premises. (Subsequently, however, in response to Donchin's special interrogatories, Swift admitted he had always known about the existence of the rottweilers and the fact they were living on his property.)

Finally, Richard H. Polsky, Ph.D., an animal behavior expert, declared that if the dogs were vicious towards Kaylor and Schreiner, then they were probably vicious towards others, including Swift during his regular visits to the premises.[1]

On May 9, 1991, Ms. Donchin filed her complaint for personal injuries against Guerrero and Swift. Donchin claims to have suffered injuries to her body, including a fractured right hip which necessitated open reduction

---

[1]Donchin offers a further challenge to the credibility of Swift's declaration denying knowledge of the rottweillers' vicious propensities. She contends Swift is a convicted felon, having pled guilty and served time for felony forgery. Respondent, while not denying the conviction, claims this court nonetheless should disregard it because Donchin failed to offer any admissible evidence concerning Swift's conviction at the summary judgment motion. We find the record unclear as to what was before the trial court to prove the prior felony conviction. We agree a prior conviction for forgery would be admissible and quite relevant on the credibility of Swift's denial of knowledge. However, we find other evidence in the record sufficient to create a triable issue about the crediblity of Swift's denial without considering the effect of this prior felony conviction. Thus, we need not and do not consider whether appellant succeeded in proving the existence of this conviction in the trial court and thus preserved the issue for appeal.

surgery. On November 19, 1993, the trial court heard codefendant Swift's motion for summary judgment and filed the following order ". . . the court finds there is no triable issue of material fact in this action and that the moving parties are entitled to summary judgment as a matter of law."

The notice of appeal was filed December 9, 1993.

## DISCUSSION

### I. *The Proper Standard of Review of a Summary Judgment Is De Novo Review, Not Abuse of Discretion.*

Both appellant and respondent state the trial court's summary judgment can be reversed only if the Court of Appeal finds the court abused its discretion in granting the motion. However, in 1973 the Legislature amended subdivision (c) of Code of Civil Procedure section 437c, making it mandatory, not discretionary, for a trial court to enter a summary judgment when there are no triable issues. The following wording was added: "The motion for summary judgment *shall* be granted if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Italics added.)

In other words, if there is no triable issue of material fact the court must grant summary judgment pursuant to motion. If, on the other hand, there is a triable issue it is error for the trial court to grant summary judgment. In *Saldana* v. *Globe-Weis Systems Co.* (1991) 233 Cal.App.3d 1505 [285 Cal.Rptr. 385] the court cited a long line of cases holding ". . . there is no discretion to be exercised by a trial court in considering a motion for summary judgment." Moreover, "[i]n reviewing an order on a summary judgment, the reviewing court employs the same process as the trial court in determining whether, as a matter of law, summary judgment was appropriate." (*Id.* at p. 1515.)

Accordingly, we follow previous cases holding the proper standard on appeal of a summary judgment is independent review. (See *Stratton* v. *First Nat. Life Ins. Co.* (1989) 210 Cal.App.3d 1071, 1083 [258 Cal.Rptr. 721] [court held that an appellate court examines the facts presented to the trial court on a summary judgment motion and independently examines their effect as a matter of law]; see also *Szadolci* v. *Hollywood Park Operating Co.* (1993) 14 Cal.App.4th 16, 19 [17 Cal.Rptr.2d 356] [the Court of Appeal stated that when reviewing a trial court's summary judgment it is not bound by the court's finding, and stated "[w]e review the ruling, not its rationale."], citing *Barnett* v. *Delta Lines, Inc.* (1982) 137 Cal.App.3d 674, 682 [187 Cal.Rptr. 219].)

Past cases have outlined a three-stage approach to appellate review of a summary judgment. In *Planned Parenthood* v. *City of Santa Maria* (1993) 16 Cal.App.4th 685 [20 Cal.Rptr.2d 391], the court explained: " '[¶] [f]irst we identify the issues framed by the pleadings. . . . [¶] Secondly, we determine whether the moving party's showing has established facts which negate the opponent's claim and justify a judgment in movant's favor . . . [¶] [T]he third and final step is to determine whether the opposition demonstrates the existence of a triable, material factual issue.' " (*Id.* at p. 690, citing *AARTS Productions, Inc.* v. *Crocker National Bank* (1986) 179 Cal.App.3d 1061, 1064-1065 [225 Cal.Rptr. 203]; see also *Torres* v. *Reardon* (1992) 3 Cal.App.4th 831, 836 [5 Cal.Rptr.2d 52], citing *Zuckerman* v. *Pacific Savings Bank* (1986) 187 Cal.App.3d 1394, 1400-1401 [232 Cal.Rptr. 458].) With the above mentioned principles in mind, we review plaintiff's claim.

## II. *A Landlord's Liability for Injuries by Tenant's Dog Following Escape From Landlord's Premises Is Determined by Whether the Landlord Knew of the Dog's Vicious Propensity and Had the Ability to Prevent the Dog's Attack.*

In granting summary judgment, the trial court ruled plaintiff did not raise a triable issue whether Swift possessed knowledge the rottweillers had vicious propensities. ▮ Under California law, a landlord who does not have actual knowledge of a tenant's dog's vicious nature cannot be held liable when the dog attacks a third person. In other words, where a third person is bitten or attacked by a tenant's dog, the landlord's duty of reasonable care to the injured third person depends on whether the dog's vicious behavior was reasonably foreseeable. Without knowledge of a dog's propensities a landlord will not be able to foresee the animal poses a danger and thus will not have a duty to take measures to prevent the attack.

In this court's view, this inquiry into the landlord's duty involves a two-step approach. The first step is to determine the landlord's knowledge of the dog's vicious nature. In *Uccello* v. *Laudenslayer* (1975) 44 Cal.App.3d 504 [118 Cal.Rptr. 741, 81 A.L.R.3d 628], the court established a landlord can only be liable if he or she had actual knowledge of the dog's vicious propensity. This actual knowledge rule has been followed in *Lundy* v. *California Realty* (1985) 170 Cal.App.3d 813 [216 Cal.Rptr. 575] and in *Portillo* v. *Aiassa* (1994) 27 Cal.App.4th 1128 [32 Cal.Rptr.2d 755]. However, it can be satisfied by circumstantial evidence the landlord *must* have known about the dog's dangerousness as well as direct evidence he *actually* knew. (*Uccello* v. *Laudenslayer, supra,* 44 Cal.App.3d 504, 514, fn. 4.)

The second step involves a landlord's ability to prevent the foreseeable harm. In *Uccello* the court relied on *Dennis* v. *City of Orange* (1930) 110

Cal.App. 16 [293 P. 865] to establish the principle the landlord's duty derives from his control and ability to prevent dangerous conditions on his property. In *Dennis,* a landlord was held liable for a nuisance created by a tenant's gravel excavation. The court stated, "[t]he ground of the defendant's liability for the nuisance is that it existed at a time when he had the opportunity or power to abate or remove it and failed to do so." (*Id.* at p. 24.) Thus, the injuries the dogs cause must be ones which would not have occurred if the landlord had taken actions which were within his power. In the cases of dangerous dogs, that potential power is found in whatever rights the landlord may have to insist the tenant remove the dogs from the leased premises or to insure the property is so secure the dogs cannot escape to harm persons on or off the property. (See discussion at pp. 1846-1847, *post.*)

In light of the above stated principles, plaintiff correctly contends the landlord owed her a duty of care if the landlord knew of the dogs' vicious propensities and if he had the power to have taken measures on the property he controls which would have prevented plaintiff's injuries.

### III. There Are Triable Issues Whether the Landlord Here Had Knowledge of the Rottweilers' Dangerous Propensities.

Both parties agreed a landlord's knowledge may be proven by circumstantial evidence. As defendant points out, such inference must reflect the landlord's actual knowledge and not merely constructive knowledge or notice. Hence, as stated by the Court of Appeal in *Uccello,* "actual knowledge can be inferred from the circumstances only if, in light of the evidence, such inference is not based on speculation or conjecture." The court continues, "[o]nly where the circumstances are such that the defendant 'must have known' and not 'should have known' will an inference of actual knowledge be permitted." (*Uccello* v. *Laudenslayer, supra,* 44 Cal.App.3d 504, 514, fn. 4, citing *Young* v. *Carlson* (1954) 128 Cal.App.2d 743, 747-750 [276 P.2d 23]; see *Lundy* v. *California Realty* (1985) 170 Cal.App.3d 813, 821 [216 Cal.Rptr. 575] [court followed *Uccello*'s actual knowledge rule].)

We thus find it necessary to determine whether Swift's knowledge may be inferred from the declarations plaintiff submitted in opposition to the summary judgment.

### A. Swift's False Exculpatory Statements Denying Any Knowledge of the Rottweilers' Existence and His Further Denial He Granted Permission for Their Presence on His Property May Be Used to Infer Guilty Consciousness as to His Knowledge of the Dogs' Viciousness.

There is more than one way to prove the existence of a fact, and thus more than one way to create a triable issue about the existence of that fact.

One way is to introduce affirmative evidence tending to show the fact exists—the testimony of someone who observed it or who observed something from which the existence of the fact may be inferred. Another way, however, is to introduce evidence tending to show an opponent's denial of the existence of the fact is to be disbelieved, that is, evidence challenging the credibility of his denial. For, as a matter of common sense as well as formal logic, to *disbelieve* the *denial* of the existence of a fact is to *believe in the existence* of that fact. (For example, a defendant's alibi defense denying he was at the scene of the crime but rather was somewhere else is proven false. The jury thus disbelieves his denial and instead believes he was at the scene.)

This alternative form of proof becomes especially important when the "fact" at issue is a party's state of mind—whether it is the party's psychological condition, attitudes, motives, or as in this case, his knowledge. It often will be difficult for others to know what a person knows or does not know. They cannot peer into his brain and unless the party tells others about what he knows there will not be witnesses who can testify about what is going on inside.

But if a party takes the affirmative step of testifying that he denies any knowledge about a certain topic it is possible to introduce evidence bearing on the credibility of that denial. This, of course, is what Swift did here, filing a declaration affirmatively denying he had knowledge the two rottweilers had any vicious propensities. Donchin countered with two types of evidence tending to prove Swift did possess that knowledge. First, she introduced affirmative evidence from which she asks us to infer Swift knew or *must* have known about the rottweilers' nature. Second, she introduced evidence challenging the credibility of Swift's declaration denying he possessed knowledge of the rottweilers' propensities.

In effect, Donchin asks us—or a subsequent fact finder—to disbelieve Swift's denial and thereby to believe the opposite, that is, to find he did possess the requisite knowledge. At this stage, of course, we only have to ask whether Donchin has introduced enough evidence to create a triable issue Swift's denial should be disbelieved. If so, summary judgment was inappropriate.

The first type of proof Donchin offered—the affirmative evidence Swift must have known about the two rottweilers' vicious nature—is fairly strong and, furthermore, as will be seen has some relevance to her challenge to Swift's credibility. Nonetheless, we find the latter more persuasive and thus concentrate on it.

In our view, the key evidence bearing on the credibility of Swift's denial of knowledge about the rottweilers' dangerous nature is his earlier "false exculpatory statement" denying he even knew the dogs existed and denying he had given permission for them to be housed on his property. Just as a criminal defendant's false exculpatory statement is evidence of his consciousness of guilt, a civil defendant's false exculpatory statement can be evidence of his consciousness of liability and casts doubt on his denial of knowledge affecting his liability.

As will be recalled, Swift made this exculpatory statement to Renae McCarthy, a legal secretary to Donchin's counsel. Swift told her he didn't even know his tenant was keeping dogs of any kind on the property and hadn't given permission to do so. Only later, in the face of a lease mentioning the dogs and the tenant's declaration Swift saw the rottweilers regularly, did Swift submit a response to interrogatories conceding he indeed knew of the dogs and claiming he played with them on several occasions. Assuming the truth of McCarthy's declaration, Swift's initial conversation with her represented a false exculpatory statement attempting to show he had no liability for what the rottweilers did to Donchin.

The law of California and other jurisdictions has long recognized a false exculpatory statement is evidence of a guilty conscience in the context of criminal cases. The underlying principle is that a false statement is evidence of a declarant's state of mind and demonstrates his knowledge he has committed a wrong. Furthermore, from this consciousness of guilt the jury is entitled to infer other facts bearing on a defendant's guilt. The logic of this principle applies as much in civil cases as it does in criminal prosecutions.

For example, in *People* v. *Mendoza* (1987) 192 Cal.App.3d 667 [238 Cal.Rptr. 1] the Court of Appeal affirmed the trial court's judgment convicting defendant of false imprisonment and attempted rape. The issue on appeal was whether a defendant's exculpatory statements to police officers may be used to show his consciousness of guilt and therefore his guilt. There, in an attempt to account for his whereabouts, the defendant told police he had just finished washing his friend's pickup truck. Yet, one of the officers had noticed a light layer of dust all over the truck. Thus, the statement, although exculpatory, was false.

The court held the defendant's statement was contradicted and hence proven false by the officers' statements. The court explained, "[f]alse statements which 'are apparently motivated by fear of detection, . . . suggest there is no honest explanation for the incriminating circumstances' and may be used as evidence of the accused's guilt." (192 Cal.App.3d at p. 673 citing *People* v. *Albertson* (1944) 23 Cal.2d 550, 582 [145 P.2d 7] (Traynor, J., conc.).)

This principle is well settled under California law. (*People* v. *Morgan* (1978) 87 Cal.App.3d 59, 67-69 [150 Cal.Rptr. 712], citing *People* v. *Underwood* (1964) 61 Cal.2d 113, 121 [37 Cal.Rptr. 313, 389 P.2d 937] [defendant's extrajudicial exculpatory statement, which is shown to be false by his own statements, may be admitted at trial to enable the jury to infer defendant's consciousness of guilt].) *Morgan* was later overruled in *People* v. *Kimble* (1988) 44 Cal.3d 480, 497-498 [244 Cal.Rptr. 148, 749 P.2d 803] on the grounds defendant's statement must be proven false by his or her own statements alone without separate corraborative proof. (See also *People* v. *Gutierrez* (1978) 80 Cal.App.3d 829 [145 Cal.Rptr. 823] [in prosecution for child molestation, defendant's contradictory statements first denying he had been with the victim, and later admitting being with the girl but claiming she consented, were admissible to show his consciousness of guilt]; *People* v. *Walker* (1950) 99 Cal.App.2d 238, 243 [221 P.2d 287] ["False statements for the purpose of misleading or warding off suspicion are indicative of consciousness of guilt"]; *People* v. *Turner* (1948) 86 Cal.App.2d 791, 801 [195 P.2d 809] ["Guilty knowledge, . . . may be shown by the facts and circumstances in the case, including . . . any false or misleading statements he may make . . . with relation to material facts, for the purpose of misleading, or warding off suspicion. Such conduct is receivable in evidence as indicating a consciousness of guilt. . . ."]; *People* v. *Flores* (1969) 269 Cal.App.2d 666, 670 [75 Cal.Rptr. 231] ["The making of a false statement for the purpose of warding off suspicion is also receivable evidence to demonstrate a consciousness of guilt."].)[2]

In the instant case Swift made the exculpatory statement as soon as he received the summons and complaint describing the rottweilers' attack. However, unlike the defendant in *Mendoza*, *supra*, Swift himself admitted his exculpatory statement to be false by later filing a response to interrogatories admitting he knew about the dogs from the rental agreement and from his visits to the property where he claimed he had played with the dogs. As mentioned above such a falsehood may be used to infer Swift had a guilty conscience about the two rottweilers and his responsibility for the injuries they caused.

---

[2]Federal case law has similarly held consciousness of guilt to be provable by circumstantial evidence such as false exculpatory statements. Most recently, in *U.S.* v. *Clark* (8th Cir. 1995) 45 F.3d 1247 the Eighth Circuit affirmed the district court's instruction the jury may infer guilty consciousness from false exculpatory statements. Similarly in *United States* v. *Holbert* (5th Cir. 1978) 578 F.2d 128, the Fifth Circuit affirmed defendant's conspiracy conviction and attempted larceny. The trial court instructed the jurors they may infer consciousness of guilt from defendant's false exculpatory statement. The circuit court explained, "As an initial matter, the appellant's argument overlooks a long line of authority which recognizes that false exculpatory statements may be used not only to impeach, but also as substantive evidence tending to prove guilt." (*Id.* at p. 129.) And again in *Martin* v. *Foltz* (6th Cir. 1985) 773 F.2d 711, 720, the court held ". . . such false exculpatory statements are probative of a guilty conscience and hence of guilt and are admissible." (See also 2 Wigmore, Evidence (3d ed. 1940) §§ 278(2) and 276(4).)

Swift's false exculpatory statement denying he knew his tenant had dogs on the leased property is evidence of the falsity of his later denial he knew the rottweilers had vicious propensities. In an analogous case, *People* v. *Gutierrez*, *supra*, 80 Cal.App.3d 829, the defendant denied he had been with the little girls who were the victims of the alleged molestation. Later, he admitted he had been with them but denied molesting the girls. The Court of Appeal held it was proper for the trial court to instruct the jury could infer the defendant had a guilty conscience about his behavior with the victims from his false exculpatory statement denying he had even been with the victim. (80 Cal.App.3d at p. 836.)

This sequence of events, a denial of knowledge about one incriminating fact followed by an admission of knowledge of that fact accompanied by a denial of another incriminating fact is exactly what happened here. And just as in *Gutierrez*, where the jury could infer defendant falsely asserted the victims had consented from his initial false exculpatory statement denying he had even been with the victims, here too the fact finder can reasonably infer Swift falsely denied he knew the dogs were dangerous from his initial false denial of knowledge they even existed.

B. *The Affirmative Evidence the Landlord Was Aware of the Dogs' Vicious Propensities Reinforces the Inference He Was Not Credible in Denying Knowledge of Those Propensities.*

The inference Swift's denial of knowledge should be disbelieved is bolstered further by some of the affirmative evidence Donchin offered suggesting the landlord indeed possessed, or must have possessed, knowledge about the rottweilers' propensities. Plaintiff presented three declarations containing affirmative evidence Swift had actual knowledge of the two rottweilers' vicious propensity.

First, Robert Kaylor, the neighbor from across the street, declared he was afraid of the rottweilers and recited incidents justifying that fear. Kaylor is a disinterested third party, and there is no evidence from the record of any special connection between him and plaintiff. Furthermore, Kaylor's statement is supported by the fact he complained of the rottweilers' behavior to Guerrero, to another neighbor, and to the animal control department. Swift, on the other hand, produced no declarations from any disinterested third parties.

Second, the UPS courier, Scott Schreiner, stated he, too, was afraid of the rottweilers. He contends he saw the rottweilers once a week, and every time he entered their area they would "growl and show their teeth, ram the wood fence, attempt to jump the fence and appeared extremely ferocious."

Finally, Richard H. Polsky, an animal behaviorist, expressed the following opinion in his declaration: "I have reviewed and studied the following material: deposition of Alpha Donchin, deposition of David Swift, deposition of Ubaldo Guerrero, plaintiff's arbitration brief, interrogatories to Swift and their responses, Department of Animal Regulations report, L.A.P.D. Injury Investigation Report, Declaration of Robert Kaylor, Declaration of Scott Screiner, photographs of injuries to the plaintiff and photographs of the premises owned by David Swift."

This expert on animal behavior described why it was unlikely Swift was unaware of the rottweilers' vicious propensities. "Displays of territorial aggressive behavior towards strangers are common in dogs of the Rottweiler breed." And he concludes: "Based on the above, it is likely that both the owner, Mr. Guerrero, and his landlord, Mr. Swift, had actual knowledge of the aggressive nature of these Rottweiler dogs. . . . Mr. David Swift, through his previous visits to the property, was aware of the presence of these dogs." And . . . "being a relative stranger, he had undoubtedly witnessed displays of territorial aggressive behavior in these dogs." Again, Swift failed to rebut this evidence with expert testimony or anything else other than his own self-serving denial of knowledge and that of his codefendant, the tenant Guerrero.

In evaluating this affirmative evidence of Swift's knowledge, both parties rely heavily on *Uccello* v. *Laudenslayer supra*, 44 Cal.App.3d 504. There the Court of Appeal reversed a nonsuit in favor of the landlord. The facts in *Uccello* are similar to the instant case. *Uccello* involved an attack upon a five-year-old girl by a German shepherd. The landlord in that case was aware of the tenant's German shepherd, based on the initial rental agreement. Furthermore, the landlord observed the dog on at least two occasions when he visited the rental property. Also, the landlord frequently drove by the property in order to inspect it, and on occasion he saw the dog in the backyard. There, like here, neighbors had complained about the dog's vicious behavior. The *Uccello* court held a reasonable inference could have been drawn from plaintiff's opening statement that the landlord was aware of the dog's dangerous propensity. Thus, *Uccello* reversed the nonsuit entered in favor of the landlord because a question of fact existed as to the landlord's knowledge of the dog's viciousness.

■ Similarly, in the instant case Swift ultimately admitted in his declaration he had observed the two rottweilers on a number of occasions. Swift went by the house leased to Guerrero at least once a month to collect the rent. Additionally, according to Guerrero's deposition and Swift's statement,

Swift was aware of the dogs from the initial rental period. Furthermore, as in *Uccello*, third persons had complained about the dogs' vicious behavior. It is true in *Uccello* there was some additional evidence not present here suggesting the landlord must have known about the propensities of his tenant's dog. However, in the instant case we also have a type of evidence not present in *Uccello,* the testimony of an expert in dog behavior expressing the opinion Swift must have known about the vicious propensities of these two rottweilers who had continually exhibited such propensities to next door neighbors and visitors.[3]

All of this affirmative evidence suggesting Swift must have known about the rottweilers' vicious propensities serves to bolster the inference he lied in denying knowledge of those propensities, an inference already drawn from Swift's false exculpatory statement claiming he did not even know the dogs existed or had not given permission for them to be on his property. The evidence that it was unlikely he was unaware of the rottweilers' vicious propensities increases still further the probability Swift made that false exculpatory statement in a failed attempt to escape liability. This evidence thus casts still further doubt on the credibility of Swift's denial he knew the Rottweilers had a vicious propensity.

Had a jury chosen to disbelieve Swift's denial of knowledge and thus returned a verdict in Donchin's favor based on the evidence before the trial court on this summary judgment motion, we would have concluded substantial evidence supported the jury's credibility judgment. A fortiori, there was ample evidence before the trial court at the summary judgment stage to create a triable issue as to whether Swift was aware of the rottweillers' vicious propensities. Accordingly, it was improper to grant summary judgment on the basis the landlord was unaware of the dogs' predispoition.

---

[3]Swift relies on *Lundy* v. *California Realty, supra,* 170 Cal.App.3d 813. *Lundy* is distinguishable from both *Uccello* and our situation. In *Lundy*, the Court of Appeal upheld a lower court's summary judgment because plaintiff did not raise a triable issue of material fact as to the landlords' knowledge of tenant's dog's vicious nature. There the trial court found the landlords only knew about the presence of the dog on tenant's property. The landlords never visited the property, nor did they ever see the dog, nor did they receive any complaints about the dog. (*Id.* at p. 816.) Thus, there could have been no reason to infer the landlord's knowledge merely from the initial rental agreement.

Swift, however, unlike the landlords in *Lundy*, did in fact visit his tenant and observe the two rottweilers on a regular basis. Moreover, in contrast to *Lundy*, in both *Uccello* and our case neighbors did have complaints about the dogs' threatening behavior. Most significantly, in the instant case, unlike *Lundy*, the landlord made a false exculpatory statement denying any knowledge the dogs existed and denying he had given permission for them to reside on his property. The landlord in *Lundy*, on the other hand, exhibited an innocent rather than a guilty conscience about the temperament of the dog living on their property.

IV. *There Is a Triable Issue Whether the Landlord's Failure to Properly Exercise His Control Over This Property Was a Cause of This Victim's Injuries Outside That Property.*

■ We now turn to Swift's alternative grounds for claiming summary judgment was proper. Assuming he knew his tenant was housing dangerous dogs on his premises, respondent claims Swift still is not liable because the dogs attacked Donchin four blocks away from his property. According to Swift, his liability does not extend to areas beyond his control.

Swift cites *Lundy* v. *California Reality, supra,* 170 Cal.App.3d 813 as limiting an owner's liability for a tenant's dog attack to the premises of the owner's property. However, *Lundy* does not so hold. The language from which Swift seeks to derive this limitation merely states, " '. . . it was simply a question of time before someone invited onto the premises would be attacked by the dog.' " (*Id.* at p. 821.) *Lundy* does not elaborate further about the fact the attack in that particular case happened to occur on the owner's property. Therefore, *Lundy* does not support Swift's contention.

Swift's rental agreement with his tenant, Guerrero, was month-to-month, and Swift could have terminated it with proper notice. Donchin further produced evidence the dogs escaped due to a damaged fence. She argues the fence relates directly to the property, as it is part of that property.

A landowner's liability for a tenant's dog's vicious attack that occurs off the premises is determined by the same standards of ordinary care as liability for attacks which occur on the premises. Liability will turn on the landowner's ability to prevent the harm. If the dog is taken on a leash by its owner, off the premises, prevention of an attack by the dog may be beyond the landlord's control. But if the dog escapes the landlord's property because of defects in that property, the landlord is liable for the off-site injuries.

Our research did not uncover any California cases dealing with liability for off-site dog bites. But we did discover some out-of-state authority. In *Cronin* v. *Chrosniak* (1988) 145 A.D.2d 905 [536 N.Y.S.2d 287], a tenant's dog got loose and attacked a six-year-old boy who was playing in a neighbor's backyard. The appellate court reversed a summary judgment entered in favor of the landlords. The New York court rejected defendants' claim they had no control over the dog and held them liable even though the attack occurred off the landlords' property. And in *Wright* v. *Schum* (1989) 105 Nev. 611 [781 P.2d 1142, 89 A.L.R.4th 359], the Nevada Supreme

Court reversed a dismissal which had prevented recovery for injuries to an 11-year-old boy caused by a tenant's pit bull dog. The dog had escaped from the tenant's yard through a broken gate.

As the above cited cases make clear, the landlord's control of the property from which the dog originated its attack, not his or her control over the property on which the attack occurred, determines the landlord's liability. Swift had sufficient control of his own leased property to ensure the outside fencing was secure enough to prevent the rottweilers from roaming the neighborhood. Both parties agreed that at least part of the fence was in fact defective. But there remains a triable issue whether the fence was in fact defective in a manner which allowed the rottweilers to escape.

Setting aside the problem with the fence, the landlord had another lever of control which could have prevented Donchin's injuries. The *Uccello* court found a month-to-month lease was sufficient indicia of control to establish a landlord's liability to third parties for injuries his tenant's dogs might cause. The court reasoned that, ". . . if a landlord has such a degree of control over the premises that it fairly may be concluded that he can obviate the presence of the dangerous animal and he has knowledge thereof, an enlightened public policy requires the imposition of a duty of ordinary care. . . . [The landlord] rented to [tenant] under a month-to-month tenancy agreement terminable upon two weeks' notice. Manifestly, upon notice, respondent could have exercised his right to terminate the tenancy and re-enter into possession of the premises unless [the tenant] got rid of the dog. It reasonably may be said that by virtue of the right of termination, respondent had sufficient control over the premises so as to bring the case within an exception to the general rule of non liability." (*Uccello* v. *Laudenslayer*, *supra*, 44 Cal.App.3d 504, 512.)

The rental agreement in the instant case was a month-to-month lease. As in *Uccello* the landlord Swift could have "obviated the presence of the dangerous animal[s]" by serving notice his tenant, Guerrero, either had to get rid of his rottweilers or vacate the premises in 30 days. Accordingly, there also is a triable issue whether the landlord is further liable for this off-site attack because he failed to exercise his power under that lease to require the removal of the two dangerous rottweilers. Had they been removed from this property they would not have been roaming the neighborhood in which the attack occurred.

## DISPOSITION

The summary judgment in favor of respondent Swift is reversed. The action is remanded for further proceedings consistent with this opinion. Appellant is awarded her costs on appeal.

Lillie, P. J., and Woods (Fred), J., concurred.

Respondents' petition for review by the Supreme Court was denied August 10, 1995.