Filed 2/9/24

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| JONI FRASER, | B324831 |
| Plaintiff and Appellant, | Los Angeles County Super. Ct. No. BC724217 |
| v. | |
| ALI FARVID et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment and order of the Superior Court of Los Angeles County. Gregory W. Alarcon, Judge. Affirmed.

Cummins & White and Eric M. Khodadian for Plaintiff and Appellant.

Mark R. Weiner & Associates and Michael H. Park for Defendants and Respondents.

_____

**SUMMARY**

Plaintiff Joni Fraser was attacked by two pit bulls who escaped from a single-family residence their owner, Hebe Crocker (Ms. Crocker or tenant), leased from Ali Farvid and Lilyana Amezcua (defendants or landlords). Plaintiff sued Ms. Crocker and defendants. Plaintiff settled with Ms. Crocker. A jury found plaintiff proved that defendants had actual knowledge of the dangerous propensity of Ms. Crocker's dogs and could have prevented foreseeable harm to plaintiff. The jury found plaintiff suffered damages of more than $600,000.

The trial court granted defendants' motion for judgment notwithstanding the verdict (JNOV), finding no substantial evidence was produced at trial demonstrating defendants' knowledge of the dogs' dangerous propensities.

Our review of the record confirms the trial court's ruling was correct. We therefore affirm the judgment for defendants.

**THE ISSUE**

We begin by describing the legal principle governing this case.

"Under California law, a landlord who does not have actual knowledge of a tenant's dog's vicious nature cannot be held liable when the dog attacks a third person. . . . Without knowledge of a dog's propensities a landlord will not be able to foresee the animal poses a danger and thus will not have a duty to take measures to prevent the attack." (*Donchin v. Guerrero* (1995) 34 Cal.App.4th 1832, 1838 (*Donchin*).) This "actual knowledge rule" can be satisfied "by circumstantial evidence the landlord *must* have known about the dog's dangerousness as well as direct evidence he *actually* knew." (*Ibid.*)

Here, we agree with plaintiff there was evidence from which the jury could have disbelieved defendants' testimony that they did not know there were *any* dogs on the property. But the

only other evidence plaintiff relies on to establish defendants actually knew the dogs were dangerous—other than challenges to defendants' credibility—was an e-mail from a next-door neighbor about the state of the property. This e-mail is neither direct nor circumstantial evidence that defendants knew or must have known the tenant's dogs were vicious.

We quote the entire e-mail in question, sent on May 29, 2017, about 15 months before plaintiff was attacked (the May 2017 e-mail): "Hi Lilyana and Ali – [¶] I hope that you are getting a nice mini break with the holiday. [¶] Lorne and I wanted to let you know of your house. We aren't sure how much you know. There is a new person living there. It is the same woman but it seems she may be either subletting or have an extended guest. [¶] We are not sure about your arrangement with the tenants. But your lawn and side yard are overgrown. A family of ferral [*sic*] cats were living in your side yard. I don't know what will happen to the babies as we saw the mom dead in the driveway of another neighbor yesterday (and what prompted me to let you know). This is from the side we share. The weeds on your side are taller than the bushes between our homes. [¶] On the good end, they are no longer burning left over marijuana plants and they are so quiet. Even the 2 guard dogs in the back are quiet. [¶] Hopefully, it's just the outside and inside is in good repair. We are not sure if you have a property manager who can check things out. [¶] We do miss having neighbors that we can talk to. [¶] Leigh."

Plaintiff contends this e-mail "itself constitutes 'substantial evidence' of [defendants'] knowledge that the dogs were dangerous." Plaintiff argues the e-mail's reference to two "guard dogs," plus defendants' "false exculpatory statements" that they did not know the tenant kept *any* dogs on the property,

3

"constitutes affirmative evidence of actual knowledge that the dogs were vicious."

Defendants, on the other hand, contend none of this constitutes evidence from which a reasonable juror could infer they knew or must have known of the dogs' vicious nature. We find the law supports defendants' position and that, on this record, the trial court correctly granted JNOV.

### FACTS

### 1.    The Background

On August 14, 2018, while she was walking her dog in the neighborhood, plaintiff was attacked by Ms. Crocker's two pit bulls (the August 2018 attack). The dogs had escaped from Ms. Crocker's back patio after someone left the gate unlatched. The facts about the attack and the severity of plaintiff's injuries are not disputed.

Defendants, a married couple, have owned the subject property since 2005. They lived there from 2006 until August 2012, when they moved to Orange County. While they lived in the home, they became friends with their next-door neighbors, Lorne Platt and Leigh Ramos-Platt. Leigh Ramos-Platt is the neighbor who sent the May 2017 e-mail; she and defendant Ms. Amezcua were both doctors, with different specialties, on the faculty at USC.

In December 2015, defendants leased the property to Ms. Crocker for a one-year term, and after that Ms. Crocker continued to rent the premises on a month-to-month basis. The lease prohibited subletting without permission and prohibited dogs without permission.

About a year after she moved in, Ms. Crocker acquired the dogs, and after "rehabilitat[ing]" them on a friend's ranch for six months, she brought the dogs to the property. She testified they

4

were her emotional support dogs; she did not ask the defendants' permission; and "never explicitly told them about my dogs."

As stated earlier, in May 2017, Ms. Ramos-Platt sent Ms. Amezcua the e-mail that is at the heart of plaintiff's case. Ms. Amezcua replied to the May 2017 e-mail later the same day. She thanked Ms. Ramos-Platt for "letting us know," and stated: "I am ccing Ali [her husband, defendant Mr. Farvid] and hope maybe Ali and Lorne can talk?  Ali is in charge of the property and all has been ok in respect to payments and when we send our handyman for repairs.  Certainly I am sure we can address the weed situation . . . and I am not sure how we can figure out the subletting issues."

As mentioned, the attack occurred in August 2018, and in October 2018, plaintiff filed this lawsuit.

Defendants did not produce the May 2017 e-mail in discovery.  At her deposition in April 2019, defendant Ms. Amezcua testified she had no communications from anyone about dogs on the premises.  (At trial, Ms. Amezcua testified that she gets more than 100 e-mails a day, and that e-mails to her USC work e-mail account from an outside e-mail account (such as the May 2017 e-mail) get erased "every 2 years or a year." Ms. Ramos-Platt testified she was not aware of any USC policy of deleting e-mails older than two years; she said she had e-mails she sent to colleagues as early as 2009.)

In May 2019, Ms. Ramos-Platt forwarded the May 2017 e-mail to counsel for plaintiff, in response to a subpoena, saying it was the only e-mail she had "regarding communication with the landlords."

Ms. Amezcua did not authenticate the May 2017 e-mail when plaintiff's counsel asked her to do so in June 2019 (and did not ask her husband to look for it in his e-mail), but she did authenticate the e-mail at trial.

5

## 2. Trial Testimony

Defendant Mr. Farvid testified that prior to the attack, he had no idea the dogs were there, and no one ever told him there were guard dogs on the property. He testified that if he had seen any dogs being kept on the property, he "would have brought that up with Ms. Crocker," "especially if they were these dogs," because that would have been a breach of the lease. When he was shown the May 2017 e-mail at trial, he said he did not recall seeing the e-mail before.

Defendant Ms. Amezcua also answered, "Not that I recall," to the question whether, prior to the attack, she knew there were any dogs on the premises.

At trial, Ms. Amezcua was questioned about her reference to a handyman in her reply to the May 2017 e-mail, and about her interrogatory response, which stated she did not have a handyman. She again said she did not have a handyman, and "I've not sent a handyman to the property." Mr. Farvid testified there was no handyman he sent to the property to perform repairs while Ms. Crocker was living there. Ms. Ramos-Platt testified she saw a handyman come to the property "maybe a few times," "[b]ut definitely after . . . I sent the email someone did come by and they cleaned up the yard."

Ms. Ramos-Platt testified that after the August 2018 attack, defendant Ms. Amezcua called her. When she returned the call, Ms. Amezcua told her, " 'Remember, I didn't know that there were dogs on the property.' " At trial, Ms. Ramos-Platt did not remember whether the conversation was before or after she (Ms. Ramos-Platt) produced the May 2017 e-mail in May 2019, but "it probably was after."

Ms. Ramos-Platt testified that she talked to Ms. Amezcua about the dogs one other time, earlier in 2017 before the May 2017 e-mail, after a "Grand Rounds" lecture Ms. Ramos-Platt had

6

given at USC.  In that conversation about "the house" and "the kids" and other things, Ms. Ramos-Platt "also mentioned that [Ms. Crocker] had dogs."  Defendants' previous tenants had had a small dog, and Ms. Amezcua asked Ms. Ramos-Platt, " 'You mean a small dog?' and I had mentioned to her 'these are not small dogs.' "

Ms. Ramos-Platt also testified that when she wrote the May 2017 e-mail, "I was really trying to convey what is going on next door.  It wasn't to convey that there were aggressive dogs.  It was to convey that there were large dogs there and I'm being completely honest here."  She also testified that the reason she called the dogs "guard dogs" was "[b]ecause they are large and they are pit bulls."  She stated she had never seen the dogs "being aggressive to any other person," and had she done so, she would have called defendants and told them about it.

Mr. Platt testified that after the May 2017 e-mail, he and defendant Mr. Farvid had a conversation about Ms. Crocker not cleaning up after her dogs.  Mr. Platt did not specifically recall Mr. Farvid's response, but "to the best of my recollection, oh, you know, I'm concerned and we'll try to take care of it."  Mr. Farvid did not seem shocked that there were dogs on his property.  The conversation "was not just the dogs, but, umm, just the yard and kind of upkeep in general.  [¶]  We were concerned about both our own sort of property and just the condition in general how it might affect us, and then also for them and their property being just looked after generally."

Mr. Farvid also testified that, before the August 2018 attack, he had a conversation with Mr. Platt about Ms. Crocker not cleaning up after her dogs.  Then he immediately repeated that he did not know about the dogs prior to the attack.  He said the conversation with Mr. Platt was "never a conversation about the dogs.  It was about the cleaning inside the property which

7

include the hedges and the front yard and general trash around the place."

One of the two defendants conducted an annual inspection of the property in 2016 and 2017, and Mr. Farvid inspected the property, including the backyard, within the six months before the August 2018 attack on plaintiff. He said he never saw any dogs or any evidence of dogs during his inspections. He also did not recall anyone being there other than Ms. Crocker, and said he would have raised the issue with Ms. Crocker if he thought other people were living there.

Alan Zhang and Bianca Griffin began subletting rooms from Ms. Crocker in early 2018. Mr. Zhang testified that he was at home during Mr. Farvid's 2018 inspection; he walked past Mr. Farvid while he and Ms. Crocker were inspecting the ceiling; and Mr. Farvid must have seen him. Mr. Zhang also said he did not know and had "no memory of the dogs being there on the day of that inspection."

There was also testimony from Susan Murray that in June 2017, the dogs attacked her 20-pound dog while she and her husband were walking their dogs. Ms. Murray had a puncture wound on her index and middle fingers inflicted by one of the pit bulls while she was trying to separate the dogs. However, Ms. Murray did not report the attack to animal control authorities. She did not want the dogs to be put down, and she believed Ms. Crocker would always leash her dogs in the future and that "it wouldn't happen again." She also testified she never had any communication with either of defendants.

Ms. Crocker testified the dogs were "there" during Mr. Farvid's 2018 inspection. She also testified the dogs had "free range" in the house, including the backyard, the upstairs master bedroom, and the living room. She did not recall Mr. Farvid having seen the dogs during the inspection, since the

8

inspection was "just for the ceiling" and "mostly to inspect water damage."

Ms. Crocker continued to live at the property and pay rent through March 2019. At her deposition, she testified that she had a conversation with Mr. Farvid about her dogs for the first time about a month or two after the August 2018 attack. She told him they were emotional support dogs; that her psychiatrist confirmed they were emotional support dogs; that Mr. Farvid "met my dogs and they were very nice"; and Mr. Farvid told her he was "a dog person" and he let her keep the dogs. Ms. Crocker also testified that Mr. Farvid "requested that I would move out because I couldn't keep the dogs there," and she "wasn't ready to part with the dogs at the time so I decided to just leave . . . ."

### 3. The Verdict and the Trial Court's JNOV Ruling

As stated at the outset, the jury found (9 to 3) both defendants had actual knowledge of the dangerous propensity of the dogs and had the ability to prevent foreseeable harm to plaintiff. The jury found Ms. Crocker 60 percent responsible, and each of defendants 20 percent responsible. Plaintiff's damages amounted to $604,977.10.

In its ruling on defendants' JNOV motion, the trial court found there was "an absence of any evidence that Defendants Farvid and Amezcua had actual knowledge that Ms. Crocker's dogs were dangerous and vicious prior to the incident involving Plaintiff." The court reviewed the evidence, observing (for example) that: Mr. Platt testified he never informed defendants the dogs were dangerous, and his main concern was the condition of the house and yard that might affect property values. Ms. Ramos-Platt acknowledged she never saw the dogs being aggressive or vicious and never told either defendant they were aggressive or vicious. The court described testimony from several other witnesses, none of whom provided any evidence defendants

9

knew or must have known the dogs were dangerous before the August 2018 attack. (This included testimony from the animal control officer who investigated the attack and found no prior incidents involving the dogs.)

As for the May 2017 e-mail from Ms. Ramos-Platt mentioning "the 2 guard dogs," the court stated: "In fact, the 'guard dog' comment says nothing to warn anyone about these dogs' dangerous propensities but has been used by Plaintiff's counsel to suggest that this comment, not remembered by Ms. Amezcua, is compelling proof that both Mr. Farvid and Ms. Amezcua had knowledge of the dangerous and vicious propensities of the two dogs." The court found the comment lacked "sufficient substantiality" to support a finding that defendants knew the dogs had dangerous propensities. The court concluded:

"[T]he fact that the words 'guard dog' [were] contained in a lengthy email, albeit in a positive light, constitutes no evidence that Defendants had knowledge of Ms. Crocker's dogs' dangerous propensities. The colloquial use of the term 'guard dogs' was used by Ms. [Ramos-]Platt in a positive light and not as a warning, in no way put the Defendant landlords on notice as to dangerous propensities, as compared to a commercial setting when guard dogs are likely trained to protect through intimidation the property they are guarding."

The court also rejected plaintiff's contention that defendant Mr. Farvid's allegedly false statements denying knowledge of the dogs on the premises "equate[d] to knowledge of the vicious propensities of the dogs." The court found the precedent on which plaintiff relied (*Donchin*, discussed *post*) was distinguishable because in that case evidence of the landlord's false statement was bolstered by other evidence the landlord knew of the dogs' vicious propensities.

10

The trial court entered judgment for defendants on October 10, 2022, and this timely appeal followed.

## DISCUSSION

"A motion for judgment notwithstanding the verdict may be granted only if it appears from the evidence, viewed in the light most favorable to the party securing the verdict, that there is no substantial evidence in support." (*Sweatman v. Department of Veterans Affairs* (2001) 25 Cal.4th 62, 68.)  The standard of review on appeal is the same:  "whether any substantial evidence—contradicted or uncontradicted—supports the jury's conclusion." (*Ibid.*)

As already mentioned, to establish a landlord's liability, the plaintiff must present either direct evidence the landlord actually knew about the dog's dangerousness or circumstantial evidence that the landlord must have known. (*Donchin, supra,* 34 Cal.App.4th at p. 1838; see *Uccello v. Laudenslayer* (1975) 44 Cal.App.3d 504, 514, fn. 4 (*Uccello*) ["[A]ctual knowledge can be inferred from the circumstances only if, in the light of the evidence, such inference is not based on speculation or conjecture. Only where the circumstances are such that the defendant 'must have known' and not 'should have known' will an inference of actual knowledge be permitted."].)

We agree with the trial court that there is neither direct nor circumstantial evidence that defendants knew or must have known Ms. Crocker's dogs were dangerous.  We turn to plaintiff's specific arguments.

## 1.    The May 2017 E-mail

Plaintiff contends the May 2017 e-mail alone constitutes substantial evidence defendants "were told the dogs were dangerous, because calling the pit bulls 'guard dogs' was the same thing as calling them 'vicious' or 'dangerous.' "  Plaintiff

11

says guard dogs "are presumed vicious," citing *Portillo v. Aiassa* (1994) 27 Cal.App.4th 1128, 1135 (*Portillo*).

Plaintiff misrepresents *Portillo*, substituting an ellipsis for the portion of a direct quotation that shows *Portillo* has no application in this case. Plaintiff omits the underlined portion of this passage: "It is reasonably foreseeable that a guard dog <u>kept in a business open to the general public</u> will injure someone; the purpose of such animals is to protect the premises and it is highly unlikely that they are docile by nature." (*Portillo, supra,* 27 Cal.App.4th at p. 1135, underscore added.) *Portillo* goes on to observe that, had the landlord inspected the liquor store before renewing the lease (as was his duty as a lessor of property for a purpose involving admission of the public (*id.* at p. 1134)), he would have observed a "Beware of Dog" sign and a newspaper article posted near the door, discussing the dog's recent attack on an attempted robber in the store, and thus learned of the dog's dangerous propensities.[1] (*Portillo,* at p. 1135.)

---

[1] Plaintiff also omits pertinent facts in quotations from or descriptions of *Frederickson v. Kepner* (1947) 82 Cal.App.2d 905, 908-909 (pet store proprietors who kept 75-pound German police dog tied on commercial premises as a watchdog, where there had been attempted robberies at a nearby store, "and permitted the dog to be unfettered only in the evenings and when accompanied by someone" allowed inference owner knew of dog's dangerous nature), and *Uccello, supra,* 44 Cal.App.3d at pages 510, 507-508 (reversing nonsuit after opening statement; a reasonable inference of landlord's knowledge could be drawn from the opening statement; facts included several visits by landlord to the property, and several drives past the residence to visually inspect the premises, where he observed the large German Shepherd dog; "Beware of Dog" signs the tenant placed and kept on the fences throughout the tenancy; meter readers were warned of a "bad

In short, *Portillo* is inapt.  Its holding is that "a landlord has a duty to exercise reasonable care in the inspection of his commercial property and to remove a dangerous condition, which includes a dog, from the premises, if he knew, or in the exercise of reasonable care would have known, the dog was dangerous and usually present on the premises." (*Portillo, supra,* 27 Cal.App.4th at p. 1132.)  Indeed, *Portillo* distinguished cases involving a family pet kept in a single-family residence (*id.* at pp. 1136-1137), where the landlord has " 'no duty to inspect the premises for the purpose of discovering the existence of a tenant's dangerous animal.' " (*Id.* at p. 1137, italics omitted.)  As we have seen, in such a case the plaintiff is required to establish the landlord actually knew or must have known the dogs were dangerous.  (*Uccello, supra,* 44 Cal.App.3d at p. 514 & fn. 4.)

Much of the remainder of plaintiff's argument about the "guard dog" e-mail as substantial evidence is addressed to two points:  that defendants "knew the guard dogs were pit bulls" and "knew the pit bulls were large."  Most of the argument consists of a screed about "common knowledge" that pit bulls "have a reputation for and are known for their vicious propensity," along with references to definitions of pit bulls, dog bite statistics, and blogs and other websites—without any citation to the record in this case.  Plaintiff states she "is not arguing that all pit bulls are vicious nor asking that the Court take judicial notice that all pit bulls are vicious."  But that is exactly what she is doing, and what this court cannot do.

---

dog" and to take precautions before entering the premises, and more).  These cases in no way resemble the facts in this record.

In sum, there is no reasonable basis for drawing an inference from the May 2017 e-mail that defendants knew or must have known the dogs were dangerous.

## 2. False Exculpatory Statements

Plaintiff contends that defendants' "false exculpatory statements" that they were unaware of any dogs being kept on the property "constitutes evidence that they knew the dogs were dangerous pursuant to *Donchin v. Guerrero.*" We do not agree.

In *Donchin,* the court reversed the trial court's grant of summary judgment on the ground that the plaintiff "introduced sufficient evidence casting doubt on the landlord's credibility to create a triable issue whether he did know the dogs were dangerous." (*Donchin, supra,* 34 Cal.App.4th at p. 1835.) The court concluded the landlord's "false exculpatory statements denying any knowledge of the rottweilers' existence and his further denial he granted permission for their presence on his property may be used to infer guilty consciousness as to his knowledge of the dogs' viciousness." (*Id.* at p. 1839.) *Donchin* framed the issue before the court as whether the court "—or a subsequent fact finder—" could be asked "to disbelieve [the defendant's] denial and thereby to believe the opposite, that is, to find he did possess the requisite knowledge. At this stage, of course, we only have to ask whether [the plaintiff] has introduced enough evidence to create a triable issue [the defendant's] denial should be disbelieved. If so, summary judgment was inappropriate." (*Id.* at p. 1840.)

The court explained that the landlord "made the exculpatory statement as soon as he received the summons and complaint describing the rottweilers' attack," and the landlord "himself admitted his exculpatory statement to be false by later filing a response to interrogatories admitting he knew about the dogs from the rental agreement and from his visits to the

14

property where he claimed he had played with the dogs." (*Donchin, supra,* 34 Cal.App.4th at p. 1842.) Indeed, the landlord testified that he enjoyed playing with the dogs when he went to collect the monthly rent payments. (*Id.* at p. 1835.) The landlord's "false exculpatory statement denying he knew his tenant had dogs on the leased property is evidence of the falsity of his later denial he knew the rottweilers had vicious propensities." (*Id.* at p. 1843.) The fact finder could "reasonably infer [the landlord] falsely denied he knew the dogs were dangerous from his initial false denial of knowledge they even existed." (*Ibid.*)

But in *Donchin,* there was a great deal more evidence than just false exculpatory statements. The court further concluded that "[t]he affirmative evidence the landlord was aware of the dogs' vicious propensities reinforces the inference he was not credible in denying knowledge of those propensities." (*Donchin, supra,* 34 Cal.App.4th at p. 1843.) The neighbor across the street declared he was afraid of the rottweilers. He complained to the tenant, another neighbor and the animal control department. (*Ibid.*) According to this neighbor, "the dogs frequently ran loose around the neighborhood, lunging towards both people and other dogs. [The neighbor] stated he was so afraid of the dogs he kept a baseball bat outside his back door as a safety measure." (*Id.* at p. 1836.)

A UPS courier stated he was afraid of the dogs; he saw them once a week and every time they would growl, show their teeth, ram the fence and try to jump over it; they appeared extremely ferocious. (*Donchin, supra,* 34 Cal.App.4th at p. 1843.) An expert on animal behavior described why it was unlikely the landlord was unaware of the rottweilers' vicious propensities; through the landlord's visits to the property, and as a relative

15

stranger, " 'he had undoubtedly witnessed displays of territorial aggressive behavior in these dogs.' " (*Id.* at p. 1844.)

*Donchin* correctly found that on the record before the court, there were material triable fact issues such that summary judgment was improvidently granted. But *Donchin* did not hold that the landlord's false exculpatory statement that he did not know his tenant owned dogs, without any other direct or circumstantial evidence, was substantial evidence sufficient to support a verdict that the landlord knew the dogs were vicious. *Donchin* must be read and understood in the context in which the opinion was written—reversal of summary judgment; it is not precedent for what constitutes substantial evidence to support a verdict after trial.[2]

In this case, there is no evidence at all of defendants' knowledge of the dogs' vicious propensities. No one other than Ms. Crocker and Susan Murray (the person who was bitten in the June 2017 incident) had any knowledge the dogs were dangerous before the August 2018 attack, and they told no one. No one,

---

[2] See *Ayon v. Esquire Deposition Solutions, LLC* (2018) 27 Cal.App.5th 487, 498 ("*Donchin* gave inadequate attention to the need for a plaintiff to present *substantial* evidence. The point of the summary judgment procedure is to test whether the plaintiff has enough evidence to support a jury verdict. Substantial evidence, however, is not synonymous with *any* evidence. Rather, substantial evidence must be sufficient to support the essential elements underlying a verdict. [Citation.] Take the example *Donchin* invoked about a criminal defendant lying about an alibi. That evidence may be relevant, and thus admissible, on the question of the defendant's guilt, but it would certainly not be substantial. That is, we would not uphold a jury verdict if the *only* evidence tying the defendant to the crime was a false claim about an alibi.").

including Mr. Platt and Ms. Ramos-Platt, ever said anything to defendants about the dogs being dangerous. Under these circumstances, the inconsistencies in defendants' testimony about their knowledge of any dogs on the property cannot, standing alone, justify an inference they knew or must have known the dogs were vicious.

Plaintiff points to another judge's January 2020 ruling denying defendants' motion for summary judgment based on the *Donchin* analysis (and adding that defendants failed to distinguish that case). Plaintiff also points to the trial court's denial of defendants' motion for nonsuit. (The court stated that "[w]ithout those two words in the email, 'guard dogs,' the court would grant the motion for nonsuit.") But plaintiff cites no authority suggesting the trial court is bound by those rulings, and we find neither is helpful to our analysis.[3]

### 3.    Respondeat Superior Liability

Finally, plaintiff contends that, even if there was no substantial evidence of defendants' knowledge, the trial court should have denied the JNOV motion "because: 1) substantial evidence supported [plaintiff's] responde[a]t superior theory of liability, which did not require proving prior knowledge of the dogs' vicious propensities and 2) by telling Ms. Crocker that she could keep her dogs, [defendants] ratified Ms. Crocker's conduct of keeping vicious dogs on the Premises." Plaintiff is mistaken.

---

[3]    Plaintiff also contends the fact that defendants "did nothing" after the attack, allowing Ms. Crocker to keep the dogs until she moved out in the spring of 2019, is "corroborating evidence" they knew the dogs were dangerous. Events transpiring after the attack "are irrelevant . . . to the issue of [the defendant's] knowledge of the dog's vicious nature." (*Uccello, supra,* 44 Cal.App.3d at p. 509, fn. 2.)

17

The jury was instructed on plaintiff's theory of vicarious liability—that Ms. Crocker was defendants' agent or employee and defendants are therefore responsible for her conduct. Plaintiff claims there was substantial evidence Ms. Crocker worked for defendants as their "onsite property manager" and the August 2018 attack "arose from the course and scope of that agency/employment." This evidence is that she sublet rooms in the house and collected rent from her subtenants, and also that defendants reduced Ms. Crocker's rent by $50 a month in exchange for "maintenance of the outside of the property . . . like keeping the yard."

The cited evidence does not show defendants employed Ms. Crocker as a "property manager," and in any event, there is no evidence Ms. Crocker was acting within the scope of any such purported employment or agency when plaintiff was harmed. Moreover, the special verdict form did not ask the jury to make either of those determinations.

Nor is there any merit to plaintiff's claim that defendants ratified Ms. Crocker's conduct by allowing her to keep her dogs after the attack. Indeed, plaintiff does not identify or discuss the elements of a ratification claim. The trial court correctly concluded there was no evidence of ratification, and the jury was not instructed on and made no finding on ratification.

## DISPOSITION

The order granting judgment notwithstanding the verdict and the judgment in favor of defendants are affirmed. Defendants are to recover costs on appeal.

GRIMES, Acting P. J.

WE CONCUR:

WILEY, J.          VIRAMONTES, J.

18