[No. B163840. Second Dist., Div. One. Jan. 30, 2004.]

BRIAN YUZON, a Minor, etc., Plaintiff and Appellant, v.
GERALD COLLINS, Defendant and Respondent.

COUNSEL

Caesar S. Natividad for Plaintiff and Appellant.

Michael Maguire & Associates, Paul Kevin Wood and Brian Y. Fujita for Defendant and Respondent.

OPINION

**ORTEGA, J.—** ██ Under California law, a landlord owes a duty of care to his tenant's invitees to prevent injury from the tenant's vicious dog when the landlord has "actual knowledge" of the dog's vicious nature in time to protect against the dangerous condition on his property. (*Uccello v. Laudenslayer* (1975) 44 Cal.App.3d 504, 507 [118 Cal.Rptr. 741].)

In this case, plaintiff was bitten by a dog owned by defendant landlord's tenants. The landlord moved for summary judgment, contending, among other things, that he owed plaintiff no duty of care due to his lack of actual prior knowledge of the dog's vicious nature. The trial court granted the motion and entered summary judgment for the landlord. We affirm.

## BACKGROUND

On April 30, 2001, plaintiff Brian Yuzon, a minor, was bitten by a dog, a pit bull or pit bull mix named Kemo. (While the complaint identified Kemo as a Rottweiller, plaintiff's separate statement identified Kemo as a pit bull or a pit bull mix.) Kemo was owned by defendants Tracy Blackburn and Fin Blackburn, who are not parties to this appeal. The incident occurred at the Blackburns' Long Beach residence, which they were renting from their landlord, defendant Gerald Collins.

Plaintiff, by and through his guardian ad litem, filed this action against the Blackburns and Collins on October 3, 2001. With regard to Collins, the complaint alleged he had negligently owned, maintained, managed and operated the premises, and had willfully failed to guard or warn against a dangerous condition on his property.

### Collins's Summary Judgment Motion

On August 8, 2002, Collins moved for summary judgment, contending, among other things, that he owed no duty of care to plaintiff because he "had no actual knowledge of the dangerous propensities of the subject dog."

Collins contended that although the Blackburns' 1993 rental agreement had authorized them to have a Springer spaniel on the property, he was unaware of Kemo's presence on the property. The Blackburns' Springer spaniel died in February 1994. According to Fin Blackburn's testimony, Collins did not know about the Springer spaniel's death. In April 1994, the Blackburns acquired a Dalmatian. The Blackburns acquired Kemo in 1999, about a year and a half before this incident. Fin Blackburn testified that when the Blackburns acquired Kemo, they did not tell Collins they had acquired Kemo.

Collins testified that while he knew the lease had authorized a Springer spaniel on the property, he was not aware of any dogs on the property. Collins testified that he never saw or heard a dog barking on the premises. Collins testified that when he learned of this incident, he was not surprised to learn about the dogs' presence because "[t]he rental agreement permitted a dog in the house."

Fin Blackburn testified that he did not believe Collins had ever seen their dogs. Fin testified that if Collins were "in the front yard walking by," he would not have a chance to see the dogs. According to Fin, "the only time he [Collins] probably would have seen the dog is if it would have stuck its head out through the curtain."

According to the deposition of Tracy Blackburn, however, Collins "should have" seen their dogs whenever he visited the property, "because, you know, you open the door, and they kind of push you and bark and stuff. Usually, I would go outside the door just to keep from having to keep fighting them at the door. They would just get all excited and jump up on the screen and stuff." Tracy Blackburn testified that about one or two years before the incident, Collins told the Blackburns "the insurance guy was coming, to let him in the backyard to look around, because the dogs, we'd have to pin [*sic*] the dogs up so the guy could come in the backyard."

In addition to contending he was unaware of Kemo's presence, Collins also contended he did not know of Kemo's dangerous propensities. Collins contended he could not have known about Kemo's vicious nature because "there is no evidence that the subject dog had ever displayed any vicious propensities prior to this incident." As proof that Kemo had never displayed any vicious propensities before this incident, Collins relied upon the following deposition testimony by Tracy Blackburn:

"Q Prior to the dog-biting incident involving Brian Yuzon, had any of your dogs ever bitten anyone, to your knowledge?

"A No.

"Q Did you ever have any complaint about either of your dogs, the Dalmatian or Kemo acting aggressively?

"A No. Well, he'd run out—if the door got open, he'd run out and that would scare people. So yes, the people across the street, because their dog was on a leash, and it worried them. They said, 'Please, make sure he doesn't get out.'

"Q Was that ever reported to Mr. Collins or his wife?

"A Not that I know of.

"Q Any other problems with your dogs being aggressive or reported to Mr. Collins or to his wife?

"A No. I didn't see that as aggressive, because I didn't feel my dog was going to hurt them, he just wanted to go play."

### Plaintiff's Opposition to Summary Judgment

In opposition to the summary judgment motion, plaintiff contended that Collins had misconstrued Tracy Blackburn's above-quoted testimony. Contrary to Collins' claim that Tracy Blackburn's testimony showed that Kemo did not demonstrate vicious propensities, plaintiff claimed the same testimony showed exactly the opposite—that Kemo had demonstrated vicious propensities. Plaintiff contended the fact that Kemo ran out and scared people showed that Kemo had a vicious nature. In addition, plaintiff claimed Kemo's vicious propensities were further established by Tracy Blackburn's testimony that Kemo was "territorial to where I wouldn't send somebody over to my house to feed my dog when I was gone, I would have kennel[]ed him."[1]

As further evidence of Kemo's vicious nature, plaintiff referred to his own deposition testimony that "Kemo, the subject dog, was usually mean to visitors Kemo did not know." Plaintiff testified:

"Q Okay. How about of Kimo [sic], did you have any fears about Kimo [sic] before the accident?

---

[1] "Q Did any of your dogs, before the biting incident, show aggressive behavior?
"A I didn't think so. You know, I never thought they would bite a person. The gardeners, we live along the riverbed and there's gardeners along the back wall. And the one dog would bark at them, and Kemo was territorial to where I wouldn't send somebody over to my house to feed my dog when I was gone, I would have kennel[]ed him. Because when nobody was there, I just couldn't be sure, because he was territorial about his property, bark and stuff. But I never thought he'd bite a kid or a person as long as we were there. But if he was alone, I didn't know how he would act. The Dalmation is not aggressive, he's deaf."

"A Yes.

"Q Okay. And how come?

"A Because he's, like, usually mean to, like, visitors he doesn't know.

"Q He barks at them or what?

"A Yeah, barks."

Plaintiff contended that Collins's prior knowledge of Kemo's aggressive propensities could reasonably be inferred from Collins's request that the Blackburns "pin the dogs up" before an insurance inspection. Plaintiff stated below, "Here, it is clear that Mr. Collins had prior knowledge of the dog's dangerous nature. Why else would he need to warn the Blackburns first so they can 'pin the dogs up' before the insurance inspector came?"

Citing *Donchin v. Guerrero* (1995) 34 Cal.App.4th 1832 [41 Cal.Rptr.2d 192] (*Donchin*), plaintiff also contended that Collins's actual knowledge of Kemo's dangerous nature could be inferred from Collins's allegedly false exculpatory denial that he knew there were dogs on the property. To show that Collins's denial was false, plaintiff relied upon Tracy Blackburn's testimony that Collins "should have" seen the dogs pushing and barking at the door whenever Collins visited the property.[2] Under *Donchin,* plaintiff contended, Collins's false denial that he knew the dogs were present constituted evidence of his prior guilty knowledge of Kemo's vicious propensities.

Plaintiff's Request for Continuance

In his opposition to the summary judgment motion, plaintiff requested a continuance of the summary judgment hearing. Plaintiff contended that his animal behavior expert, Richard H. Polsky, Ph.D., needed more time to review discovery materials and prepare his declaration. (Code Civ. Proc., § 437c, subd. (h).)

*Collins's Reply in Support of Summary Judgment*

In reply, Collins sought to distinguish *Donchin, supra,* 34 Cal.App.4th 1832, on the ground "that when Mr. Collins stated he had no knowledge of

---

[2] Plaintiff submitted Tracy Blackburn's deposition testimony that in the year before this incident, Collins had visited the property "maybe three or four" times. She stated: "I don't know, maybe three or four. Because we would see him, he did some painting. We lose track of time, but he's done some painting across the street and different things. Sometimes we would just talk, because he came over, we pay the rent, then I would go out, because of the dogs, and go out on the front porch and talk to him and stuff. But it wasn't often, it wasn't every month or anything. [¶] Q Once in a while? [¶] A Yeah."

the dogs at the Blackburns['], he was specifically referring to the subject dog." Collins disputed that he had made a false exculpatory denial from which his guilty knowledge of Kemo's vicious propensities could be inferred. Collins emphasized that while the lease permitted the Blackburns to have a Springer spaniel on the property, he "still did not know that the Blackburn[s] had acquired the subject dog. The subject dog's owner, Fin Blackburn, states as much as in his deposition: [¶] 'Q. When you got the [subject dog], did you tell Collins[] that you had gotten a dog? [¶] A. No. (Deposition of Fin Blackburn, Page 25, Lines 13–15). [¶] Furthermore, when asked if Mr. Collins knew if the Blackburns had dogs or not, Mr. Blackburn replied, 'I believe he probably assumed we had the springer spaniel. He didn't know the dog died, so he would have to assume we still had it.' (Deposition of Fin Blackburn, Page 21, Lines 23–25; page 22, lines 1–2). Mr. Blackburn also opined, 'I don't believe Gerry [Collins] has ever seen the dogs.' (Deposition of Fin Blackburn, Page 19, Line 17). [¶] Defendant's motion for summary judgment emphasizes the fact that Mr. Collins did not know of the existence of the *subject dog*. This is not to say that Mr. Collins was not aware of the existence of dogs on the property. Mr. Collins believed that the springer spaniel dog was likely the dog on the property. He stated as much in his deposition testimony: [¶] 'Q. At any time before Fin told you that there was a dog bite accident at 1502 Stevely, were you aware that there was a dog or dogs at 1502 Stevely that's not a springer spaniel dog? [¶] A. No. [¶] . . . [¶] Q. Did you ever hear a dog barking from inside 1502 Stevely? [¶] A. No, not that I remember.' (Deposition of Gerald Collins, Page 31, Lines 20–24; Page 32, Lines 5–7). [¶] Thus it becomes clear that when Mr. Collins stated he had no knowledge of the dogs at the Blackburns['], he was specifically referring to the subject dog."

## Summary Judgment Ruling

At the summary judgment hearing, the trial court denied plaintiff's request for continuance, stating the expert's declaration would not shed light on whether Collins had prior actual knowledge of Kemo's presence and vicious propensities.

Regarding Collins's contention that he did not have actual knowledge of Kemo's presence and vicious propensities, the trial court concluded that Collins had successfully shifted the burden of producing evi dence to plaintiff. The trial court stated in part: "But they have shown that Mr. Collins, by his own testimony, did not know of this dog and did not know this dog might bite. So doesn't that shift the burden over to you to prove otherwise? And if so, then that hasn't been proven by your clients." The court also remarked: "I'm asking is there any proof that Mr. Collins knew of this dog or this dog's

propensities? Yes, he knew there were dogs. It was in the rental agreement. But did he know of this dog and this dog's propensities—or at least as you alleged—propensities?"

In announcing its ruling, the trial court stated: "The court is going to grant summary judgment because the court does believe that a reasonable trier of fact would find, more likely than not, that plaintiff cannot meet the burden with regard to notice to Mr. Collins who is the owner of the property not the owner of the animals." The court's subsequent written ruling stated in part: "Having considered all of the evidence set forth in the papers submitted by the parties, and after oral argument, the Court determined that there is no triable issue as to any material fact, and that for the reasons set forth in the Motion for Summary Judgment, moving party had no liability in this matter. Specifically, the Court found that moving party did not have actual knowledge of the dangerous propensities of the dog that bit plaintiff, and therefore had no duty to prevent the harm alleged."

### Plaintiff's Motion for Reconsideration

In his motion for reconsideration of the summary judgment ruling (Code Civ. Proc., § 1008, subd. (a)), plaintiff submitted Dr. Polsky's declaration. Plaintiff stated that Dr. Polsky's declaration constituted new evidence showing that Collins knew or must have known about Kemo's vicious propensities.

Dr. Polsky declared in part: ". . . I have also concluded that Gerald Collins, through his visits to the Blackburn residence during the time Kemo resided there, as noted in the depositions of Fin Blackburn (specifically, see page 17, lines 23–25)[3] and Tracy Blackburn (specifically, see page 9, lines 11–18; *also* page 11, lines 17–22; also page 12, lines 2–9)[4] must have known about the presence of Kemo on his property and this dog's propensities for territorial

---

[3] Page 17, lines 23–25: "Q Has he visited your home when you already owned the Dalmatian and the pit bull mix? [¶] A He's come to the door, but I don't believe the house."

[4] Page 9, lines 11–18: "Q Today, how often do you see Mr. Collins? A We don't see him that often. You know, he comes by sometimes—we're late with rent, and he'll come to the door or he'll call, but he never comes to the house as a rule, just sometimes if he has something special. Like, I know when his insurance was renewed, he had to come to the house and check things out in the yard and whatnot, because they had some issues, but that's been a while."

Page 11, lines 17–22: "Q Did you say that once in a while, Mr. Gerald Collins would come to your house when the rental payments are late? [¶] A Yeah, or if he needed help with computer questions. My husband does computer work. So sometimes, he comes to ask him questions about that."

Page 12, lines 2–9: "Q Do you know if any of those times that he would come by your house by the door, before the dog-biting incident, that he would have seen the dogs? [¶] A He should have, because, you know, you open the door, and they kind of push you and bark and

aggressive behavior." Dr. Polsky stated that "[a]dult male pit bulls, like Kemo, are often unpredictable in nature and frequently possess an inherent propensity for aggressive responding towards unfamiliar people who come near their territory." According to Dr. Polsky, "the owners appeared aware of the potential for aggression in not only Kemo but the other dog as well, by regularly confining them whenever visitors, such as children, arrived at the property." Dr. Polsky said that Kemo's barking at "strangers entering or approaching his territory" was "reflective of a dog who could be dangerous towards unfamiliar people entering the dog's territory."

Dr. Polsky inferred from the severity of plaintiff's injuries that Kemo must have previously demonstrated vicious propensities that visitors such as Collins must have noticed. Dr. Polsky stated that "[t]he attack by Kemo on Brian Yuzon was so persistent and vicious in nature that it is inconceivable that this was a first-time display of territorial aggression by this dog. Only a dog who has had considerable experience at displaying aggressive behavior in the past could have attacked in such a vicious manner—that is, repeated, uninhibited biting to the arm of Brian Yuzon resulting in severe injury. See pictures of injuries to Brian Yuzon's arm. Further, as noted above, considering that Kemo was an adult when the incident happened (suggesting that his habit for territorial aggression had become established and reinforced), adds credence to the belief that Kemo was a dog who possessed vicious behavioral propensities prior to the attack on Brian Yuzon. I believe these propensities would have undoubtedly been apparent to any stranger visiting the Blackburn residence, such as the landlord Gerald Collins."

Dr. Polsky concluded that because Collins had visited the "property at least on some occasions during the time Kemo resided there, he must have known of Kemo's presence and of his aggressive nature due to this dog's strong territorial proclivities. Kemo's aggressive territorial reactions towards other unfamiliar people such as Gerald Collins had to have contained elements of or have been consistent with the nature of the attack on Brian Yuzon. Thus, despite the denial of Gerald Collins and the Blackburns about Kemo's aggressive nature, for the reasons stated above, I find it inconceivable they were unaware of his aggressive nature and the potential danger he presented to people who approached or entered the property. I do not believe that Kemo's attack on Brian Yuzon was an aberrant action in a male pit bull dog with a supposedly non-aggressive temperament. It could not have been an isolated incident. I believe the incident was foreseeable to both Gerald Collins and his tenants."

stuff. Usually, I would go outside the door just to keep from having to keep fighting them at the door. They would just get all excited and jump up on the screen and stuff."

In opposition to the motion for reconsideration, Collins objected that Dr. Polsky's declaration did not constitute new evidence under Code of Civil Procedure section 1008. Collins pointed out that Dr. Polsky had formulated his opinions based upon the same deposition testimony that the court had examined in determining the summary judgment motion. Collins objected to Dr. Polsky's declaration, contending it was "based entirely on speculation and conjecture . . . ." Contrary to Dr. Polsky's allegedly speculative contention that Kemo was confined when visitors were present because of his violent nature, Collins pointed out that Kemo may have been confined because dogs "are loud, they smell, they have fleas, they get in the way, or even that the Blackburns' guests might be cat lovers." Collins also noted that there was no evidence of a prior attack by any of the Blackburns' dogs.

The trial court denied the motion for reconsideration. The court found that Dr. Polsky's declaration failed to constitute new evidence warranting reconsideration, and even if the declaration constituted new evidence, it failed to provide a basis to change the court's ruling.

Plaintiff appealed from the summary judgment.

## DISCUSSION

■ Summary judgment is appropriate only where no material issue of fact exists or where the record establishes as a matter of law that a cause of action asserted against a party cannot prevail. After examining the facts before the trial judge on a summary judgment motion, an appellate court independently determines their effect as a matter of law. (*Nicholson v. Lucas* (1994) 21 Cal.App.4th 1657, 1664 [26 Cal.Rptr.2d 778].)

According to section 437c, subdivision (p)(2) of the Code of Civil Procedure, "A defendant or cross-defendant has met his or her burden of showing that a cause of action has no merit if that party has shown that one or more elements of the cause of action, even if not separately pleaded, cannot be established, or that there is a complete defense to that cause of action. Once the defendant or cross-defendant has met that burden, the burden shifts to the plaintiff or cross-complainant to show that a triable issue of one or more material facts exists as to that cause of action or a defense thereto. The plaintiff or cross-complainant may not rely upon the mere allegations or denials of its pleadings to show that a triable issue of material fact exists but, instead, shall set forth the specific facts showing that a triable issue of material fact exists as to that cause of action or a defense thereto."

### I

Plaintiff contends the trial court erred in granting summary judgment without making specific findings and identifying the evidence which supports

its ruling. (Code Civ. Proc., § 437c, subd. (g) [upon granting summary judgment, the court shall, by written or oral order, specify the reasons for its determination and refer to the evidence that supports its determination that no triable issues exist].) Plaintiff relies upon *Continental Ins. Co. v. Superior Court* (1985) 165 Cal.App.3d 1069 [212 Cal.Rptr. 140], in which the appellate court issued a writ of mandate directing the trial court to vacate the denial of summary judgment, reconsider the motion, and enter an order complying with the statutory requirements by referring to the evidence showing the existence of a triable issue of material fact.

This case, however, is in an entirely different procedural posture. This is not a situation where the record is silent as to why the trial court denied a summary judgment motion. Here, the record shows that the trial court granted Collins's summary judgment motion after noting that Collins had established, "by his own testimony, [that he] did not know of this dog and did not know this dog might bite. So doesn't that shift the burden over to you to prove otherwise? And if so, then that hasn't been proven by your clients." The court also remarked: "I'm asking is there any proof that Mr. Collins knew of this dog or this dog's propensities? Yes, he knew there were dogs. It was in the rental agreement. But did he know of this dog and this dog's propensities—or at least as you alleged—propensities?" We believe the trial court sufficiently identified the evidence it was relying upon to comply with the statutory requirements.

## II

Plaintiff contends the trial court impermissibly weighed conflicting evidence in granting the summary judgment motion. In support of this contention, plaintiff refers to the trial court's statement: "The court is going to grant summary judgment because the court does believe that a rea sonabletrier of fact would find, more likely than not, that plaintiff cannot meet the burden with regard to notice to Mr. Collins who is the owner of the property not the owner of the animals."[5]

It is not entirely clear whether the trial court impermissibly weighed the evidence and granted summary judgment for Collins because it found that a

---

[5] Plaintiff alluded to this issue below in his written motion for reconsideration, stating: "After oral argument, the court granted the motion for summary judgment in defendant's favor, finding that a trier of fact will 'more likely than not' conclude that defendant Gerald Collins did not know about the vicious propensities of the subject dog." At the hearing on the reconsideration motion, plaintiff raised the issue directly, stating: "And in a motion for summary judgment, Your Honor, if I may, we don't weigh the evidence of which one is greater or not, as long as we present evidence that is sufficient to support a jury verdict and avoid a directed verdict, that should be enough."

trier of fact would "more likely than not" conclude that Collins did not have actual knowledge of Kemo's vicious propensities. In any event, the "more likely than not" language may have come from language found in *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 856–857 [107 Cal.Rptr.2d 841, 24 P.3d 493]. [6] As pointed out by Division Five in *Kids' Universe v. In2Labs* (2002) 95 Cal.App.4th 870 [116 Cal.Rptr.2d 158], certain passages in *Aguilar* "can be read to infer that, at the summary judgment stage, if there are equally conflicting inferences to be drawn from the evidence, the moving defendant is entitled to the benefit of that conflict and the motion must be granted. If so, this language would conflict with that recited elsewhere in *Aguilar* where the Supreme Court held that if there is a conflict in the inferences such that a triable issue exists, the summary judgment motion must be denied. (*Aguilar v. Atlantic Richfield Co., supra,* 25 Cal.4th at p. 856.)" (*Kids' Universe v. In2Labs, supra,* 95 Cal.App.4th at p. 881.)

---

[6] In *Aguilar,* the Supreme Court stated: "But, even though the court may not weigh the plaintiff's evidence or inferences against the defendants' as though it were sitting as the trier of fact, it must nevertheless determine what any evidence or inference *could show or imply to a reasonable trier of fact.* . . . In so doing, it does not decide on any finding of its own, but simply decides what finding such a trier of fact could make for itself. (Cf. *Kidron v. Movie Acquisition Corp.* (1995) 40 Cal.App.4th 1571, 1580–1581 [47 Cal.Rptr.2d 752] [motion for nonsuit]; *Salter v. Keller* (1964) 224 Cal.App.2d 126, 128 [36 Cal.Rptr. 430] [same].)" (*Aguilar v. Atlantic Richfield Co., supra,* 25 Cal.4th at p. 856.)

The Supreme Court further explained: "Thus, if the court determines that any evidence or inference presented or drawn by the plaintiff indeed shows or implies unlawful conspiracy *more likely than* permissible competition, it must then deny the defendants' motion for summary judgment, even in the face of contradictory evidence or inference presented or drawn by the defendants, because a reasonable trier of fact could find for the plaintiff. Under such circumstances, the unlawful-conspiracy issue is triable—that is, it must be submitted to a trier of fact for determination in favor of either the plaintiff or the defendants, and may not be taken from the trier of fact and resolved by the court itself in the defendants' favor and against the plaintiff. [¶] But if the court determines that all of the evidence presented by the plaintiff, and all of the inferences drawn therefrom, show and imply unlawful conspiracy *only as likely as* permissible competition *or even less likely,* it must then grant defendants' motion for summary judgment, even apart from any evidence presented by the defendants or any inferences drawn therefrom, because a reasonable trier of fact could not find for the plaintiff. Under such circumstances, the unlawful-conspiracy issue is not triable—that is, it may not be submitted to a trier of fact for determination in favor of either the plaintiff or the defendants, but must be taken from the trier of fact and resolved by the court itself in the defendants' favor and against the plaintiff." (*Aguilar v. Atlantic Richfield Co., supra,* 25 Cal.4th at pp. 856–857, fn. omitted.)

In a footnote omitted from the above quotation, the Supreme Court further discussed the availability of summary judgment when the possibility of an unlawful conspiracy is equally as likely as permissible competition, stating: "Accord, 2 Areeda and Hovenkamp, Antitrust Law [(rev. ed. 1995)] paragraph 322, page 70 (stating that, 'when the evidence is in equipoise on a matter that a party must establish by a preponderance of the evidence, summary judgment will be granted against that party'); 6 Areeda, Antitrust Law, *supra,* paragraph 1423d, page 139 (implying that, when a reasonable trier of fact 'cannot say whether' a 'conspiratorial or non-conspiratorial explanation is more probable,' 'summary judgment . . . would have to be given against the party bearing the burden of persuasion' by a preponderance of the evidence)." (*Aguilar, supra,* 25 Cal.4th at p. 857, fn. 27.)

Division Five concluded that *Aguilar* did not create a new summary judgment standard which requires the denial of the motion in all cases where there are equally conflicting inferences to be drawn from the evidence.[7] At least one appellate court, however, apparently has assumed that *Aguilar*'s discussion of competing inferences would apply to a fraudulent conveyance cause of action.[8]

We need not decide whether *Aguilar* rewrote the summary judgment standard for all cases. As discussed below, we have independently examined the record and determined that even under the "old" standard, Collins is entitled to summary judgment as a matter of law. Accordingly, we need not consider whether the trial court applied an incorrect standard, because we review the trial court's ruling independently. Given that " 'a summary judgment motion raises only ques tions of law regarding the construction and effect of the supporting and opposing papers, we independently review them on appeal, applying the same three-step analysis required of the trial court.' (*AARTS Productions, Inc. v. Crocker National Bank* (1986) 179 Cal.App.3d 1061, 1064 [225 Cal.Rptr. 203] . . . .) We must identify the issues framed by

---

[7] Division Five stated: "Typically, in summary judgment litigation, equally conflicting evidence requires a trial to resolve the dispute. [Citations.] The language in *Aguilar* cited in the immediately preceding paragraph concerning illegal conspiracy versus legal competition does not retreat from this black letter statement of California law that equally conflicting evidence typically requires the denial of a summary judgment motion. As can be noted, the Supreme Court was discussing a limited rule concerning evidence in 'equipoise' on the issue of permissible competition versus an unlawful conspiracy in the antitrust context. (*Aguilar v. Atlantic Richfield Co., supra,* 25 Cal.4th at p. 857, fn. 27.) Under both state and federal antitrust law, ambiguous evidence or inferences showing conduct that is equally consistent with permissible competition as it is with illegal conspiracy is insufficient to meet a plaintiff's burden on summary judgment or at trial; such evidence would not allow a trier of fact to find an unlawful conspiracy more likely than not. (*Id.* at pp. 846–847, 851–852.)" (*Kids' Universe v. In2Labs, supra,* 95 Cal.App.4th at p. 881.) Division Five concluded that *Aguilar*'s discussion of equally competing inferences was limited to the context of antitrust conspiracy cases: "The cited language concerning antitrust conspiracy evidence in equipoise does not hold that if inferences are in conflict in other contexts, summary judgment is now appropriate given the 1992 and 1993 amendments to section 437c. [Citation.] There is no evidence the Legislature intended such a dramatic change in the summary judgment law. [Citations.] If the evidence in tort cases such as this one is equally in conflict as to a material fact, summary judgment is not in order." (*Id.* at pp. 881–882.)

[8] In *Annod Corp. v. Hamilton & Samuels* (2002) 100 Cal.App.4th 1286 [123 Cal.Rptr.2d 924], the court stated, "Just how a party moving for summary judgment carries his or her burden depends on the burden of proof at trial. In this case, [plaintiff], at trial, would be required to show fraudulent intent by a preponderance of the evidence. . . . A defendant moving for summary judgment against a plaintiff who would bear the burden of proof by a preponderance of the evidence at trial 'must present evidence that would require a reasonable trier of fact *not* to find any underlying material fact more likely than not . . . .' (*Aguilar v. Atlantic Richfield Co., supra,* 25 Cal.4th at p. 851 . . . .)" (*Annod Corp. v. Hamilton & Samuels, supra,* 100 Cal.App.4th at p. 1293.)

the pleadings, determine whether the moving party has negated the opponent's claims, and determine whether the opposition has demonstrated the existence of a triable, material factual issue. (*Id.* at pp. 1064–1065.) [¶] 'On appeal our review is limited to the facts shown in the documents presented to the trial judge in making our independent determination of their construction and effect as a matter of law.' (*Bonus-Bilt, Inc. v. United Grocers, Ltd.* (1982) 136 Cal.App.3d 429, 442 [186 Cal.Rptr. 357] . . . .)" (*Kim v. Sumitomo Bank* (1993) 17 Cal.App.4th 974, 978–979 [21 Cal.Rptr.2d 834].)

### III

As stated in *Uccello v. Laudenslayer, supra,* 44 Cal.App.3d 504, "a duty of care may not be imposed on a landlord without proof that he knew of the dog and its dangerous propensities. Because the harboring of pets is such an important part of our way of life and because the exclusive possession of rented premises normally is vested in the tenant, we believe that *actual* knowledge and not mere constructive knowledge is required. For this reason we hold that a landlord is under no duty to inspect the premises for the purpose of discovering the existence of a tenant's dangerous animal; only when the landlord has actual knowledge of the animal, coupled with the right to have it removed from the premises, does a duty of care arise." (*Id.* at p. 514, fn. omitted.) The court in *Uccello* further stated: "We point out, however, that a defendant's actual knowledge may be shown, not only by direct evidence, but also by circumstantial evidence. Hence, his denial of such knowledge will not, per se, prevent liability. [Citations.] However, actual knowledge can be inferred from the circumstances only if, in the light of the evidence, such inference is not based on speculation or conjecture. Only where the circumstances are such that the defendant 'must have known' and not 'should have known' will an inference of actual knowledge be permitted. [Citation.]" (*Id.* at p. 514, fn. 4.)

Plaintiff states that "[i]f [Collins] did not know that the subject dog even existed, then he could not have known that the subject dog was dangerous. In addition, if the subject dog was not dangerous, then [Collins] could not have known that the dog was dangerous. In either case, [Collins] will be entitled to a grant of summary judgment. [¶] However, if both of the contentions are proven to be in dispute or that there was no prima facie showing of nonexistence of a triable issue, then the grant of summary judgment must be reversed."

According to Tracy Blackburn's testimony, (1) Collins should have seen the dogs pushing, barking, and jumping on the screen door, and (2) Collins must have known of the dogs' presence because he had asked that they be confined during the insurance inspection. Given that the Blackburns had only

one dog until they acquired Kemo, plaintiff contends it is reasonable to infer from Collins's request that the "dogs" be confined that "Collins knew of the existence of *more than* one dog at the Blackburn's residence, which would include Kemo."

We agree that Tracy Blackburn's testimony would support a reasonable infer ence that Collins was aware that dogs were present on the property. As Collins pointed out below, however, while he was aware that the lease permitted dogs on the property, he was not specifically aware of Kemo's presence on the property. Moreover, Collins could not have known of Kemo's vicious propensities given the lack of any prior incidents involving Kemo or the other dogs.

The canine behavior that Collins observed, according to Tracy Blackburn's testimony, was limited to pushing, barking, and jumping at the screen door. As one court put it, "such activities are quite common for a dog. [Citations.]" (*Nava v. McMillan* (1981) 123 Cal.App.3d 262, 265–266 [176 Cal.Rptr. 473].) "[E]ven if the dogs had been barking or jumping against the fence behind which they were kept, those are harmless activities ordinarily associated with, and expected from, dogs." (*Id.* at p. 267.) Pushing, barking, and jumping at the screen door would not have given Collins actual notice of Kemo's vicious propensities.

There is no evidence that the other canine behaviors described by Tracy Blackburn—that Kemo ran out and scared the neighbors whose dog was on a leash—were either observed by Collins or reported to him before this incident. Tracy Blackburn testified that she did not view these behaviors as signs of aggression, "because I didn't feel my dog was going to hurt them, he just wanted to play." She also testified that no reports were ever made to Collins of any problems with the dogs being aggressive.

Even if we were to assume that Collins knew that Kemo ran through open doors and scared the neighbors, his actual knowledge of Kemo's vicious propensities may not be inferred unless the circumstances were such that he must have known, and not just should have known, of the dog's vicious nature. (*Uccello v. Laudenslayer, supra,* 44 Cal.App.3d at p. 514.) The sorts of behaviors described in the record were normal dog behaviors and were not so alarming that Collins must have known (had he been aware of the behaviors) of Kemo's vicious propensities.

We distinguish *Donchin, supra,* 34 Cal.App.4th 1832, in which the tenant's dogs displayed vicious propensities that would have been apparent to anyone, including the landlord, who regularly visited the property. In *Donchin,* a neighbor attested that "the dogs frequently ran loose around the

neighborhood, lunging towards both people and other dogs." (*Id.* at p. 1836.) In addition, a UPS employee described the behavior of the dogs as so "threatening . . . toward him" that he would "toss the packages over the fence into the yard because he feared the two rottweilers." (*Ibid.*) The UPS employee stated that "he saw the rottweilers once a week, and every time he entered their area they would 'growl and show their teeth, ram the wood fence, attempt to jump the fence and appeared extremely ferocious.' " (*Id.* at p. 1843.)

In this case, on the other hand, there is no evidence that Kemo ever lunged at people or other dogs before this incident, or that he ever growled, bared his teeth, rammed a fence (or other barrier), or appeared extremely (or even slightly) ferocious. There is also no evidence that Kemo was kept in the front yard, where he could be seen exhibiting threatening behavior toward outsiders such as was observed by the UPS employee in *Donchin,* who was so afraid that he tossed the packages over the fence. On the contrary, in this case the record supports the inference that Kemo was kept inside the house, away from view of those walking by the home. According to Fin Blackburn, if Collins were "in the front yard walking by," he would not have had a chance to see the dogs. Fin stated that "the only time he [Collins] probably would have seen the dog is if it would have stuck its head out through the curtain." Similarly, Tracy Blackburn testified that she would go outside on the porch to talk to Collins "just to keep from having to keep fighting [the dogs] at the door."

In *Donchin,* the landlord regularly visited the property. (34 Cal.App.4th at p. 1836.) Accordingly, it was reasonable to infer in *Donchin* that the landlord must have seen the dogs behaving aggressively, in the same manner as was described by the UPS employee and neighbor. In this case, on the other hand, Collins visited the property infrequently and Kemo was not kept outside where his vicious propensities could be observed. We therefore distinguish *Donchin*, where the landlord's false exculpatory denials of any knowledge of the vicious dogs' existence and of having given permission for the dogs to be present on the property, were deemed to constitute evidence of his consciousness of liability. (*Donchin, supra,* 34 Cal.App.4th at pp. 1840–1844.) Moreover, in this case, Collins never denied having given permission for the dogs to be present. A fair reading of Collins's testimony shows that he knew there were dogs on the property, but not that Kemo, or any other particular dog, was on the property. While portions of Collins's deposition may be taken as a denial of any knowledge that dogs were present, he did not make the same sort of denial as the landlord in *Donchin.* Unlike the landlord in *Donchin,* Collins also testified that he did not know what specific dogs were present but that he knew the lease permitted dogs.

Given the absence of any evidence of prior vicious propensities in this case, Collins' request to have the dogs confined while the insurance inspector looked in the backyard does not support a reasonable inference that Collins had actual knowledge of Kemo's vicious propensities. In the absence of any evidence that Collins knew or must have known Kemo was dangerous, it would be purely speculative to infer that his request to confine the dogs was based on his knowledge that Kemo was dangerous. "An issue of fact can only be created by a conflict of evidence. It is not created by 'speculation, conjecture, imagination or guess work.' [Citation.] Further, an issue of fact is not raised by 'cryptic, broadly phrased, and conclusory assertions' [citation], or mere possibilities [citation]." (*Sinai Memorial Chapel v. Dudler* (1991) 231 Cal.App.3d 190, 196–197 [282 Cal.Rptr. 263].)

■ We conclude, as a matter of law, that the evidence in this case fails to support an inference that Collins had actual knowledge of Kemo's vicious propensities.

## IV

Plaintiff contends that because Collins failed to meet his burden of producing evidence to show that Kemo had not previously displayed vicious propensities, the burden of producing evidence never shifted to plaintiff. According to plaintiff, Tracy Blackburn's testimony failed to support Collins's contention that Kemo had not previously displayed vicious propensities. Tracy's testimony, plaintiff contends, was "at best ambiguous" because after initially denying that she received complaints about the dogs' aggressive behavior, she then qualified her answer: "No. Well, he'd run out—if the door got open, he'd run out and that would scare people. So yes, the people across the street, because their dog was on a leash, and it worried them. They said, 'Please, make sure he doesn't get out.' "

The fact that Kemo ran out the door and scared the neighbors whose dog was on a leash does not, as a matter of law, support an inference that Kemo was a dangerous dog. If that were the case, then all dogs would be deemed dangerous, as a matter of law, and no reasonable landlord would ever permit dogs on rental property for fear of liability.

■ We conclude Collins's evidence that Kemo had not previously displayed vicious propensities was sufficient to shift to plaintiff the burden of producing admissible evidence to show the existence of a triable issue of material fact.

## V

Plaintiff contends the trial court abused its discretion in denying his motion for continuance.

Code of Civil Procedure section 437c, subdivision (h) provides: "If it appears from the affidavits submitted in opposition to a motion for summary judgment or summary adjudication or both that facts essential to justify opposition may exist but cannot, for reasons stated, then be presented, the court shall deny the motion, or order a continuance to permit affidavits to be obtained or discovery to be had or may make any other order as may be just. . . ."

" 'Generally, power to determine when a continuance should be granted is within the discretion of the court, and there is no right to a continuance as a matter of law. [Citation.] However, Code of Civil Procedure section 437c mandates a continuance of a summary judgment hearing upon a good faith showing by affidavit that a continuance is needed to obtain facts essential to justify opposition to the motion.' [Citation.]" (*Aguimatang v. California State Lottery* (1991) 234 Cal.App.3d 769, 803–804 [286 Cal.Rptr. 57].)

In this case, plaintiff sought a continuance to obtain Dr. Polsky's expert declaration regarding Collins's actual knowledge of Kemo's vicious propensities. While the subject matter (Collins's knowledge of Kemo's vicious propensities) was essential to plaintiff's opposition to the summary judgment motion, the trial court was ultimately proven correct in concluding Dr. Polsky's declaration has no material relevance regarding that issue. As we explain below, Dr. Polsky's declaration, when reviewed by the trial court with regard to the motion for reconsideration, failed to create a triable issue of material fact. Accordingly, there was no error in denying the motion for continuance.

## VI

The trial court denied the motion for reconsideration, finding that (1) Dr. Polsky's declaration failed to constitute new evidence warranting reconsideration, and (2) even if the declaration constituted new evidence, it failed to provide a basis to change the court's ruling. Plaintiff contends the trial court erred in making both determinations. Given that the court actually considered the declaration, we need not resolve the first issue. In order to establish prejudicial error, plaintiff must show that the declaration was sufficient to warrant reconsideration of the summary judgment ruling.

Plaintiff's reliance upon *Donchin, supra,* 34 Cal.App.4th 1832, is misplaced. Plaintiff contends that because Dr. Polsky's declaration was relied upon in *Donchin* to create a triable issue of material fact regarding the landlord's actual knowledge of the dog's vicious nature, Dr. Polsky's declaration was also sufficient to create a triable issue of material fact in this case.

Dr. Polsky's declaration was not the main evidence relied upon in *Donchin*. *Donchin* was essentially a false exculpatory denial case where, due to the

unique circumstances of that case, the landlord's false exculpatory statement was evidence of his consciousness of guilt. (*Donchin, supra,* 34 Cal.App.4th at pp. 1840–1844.) The appellate court specifically stated that the inference of guilty knowledge derived from the landlord's false exculpatory statement was the "more persuasive" evidence in the case. (*Id.* at p. 1840.) Dr. Polsky's declaration, like the neighbor's and UPS employee's declarations, merely "bolstered" the inference of guilty knowledge derived from the false exculpatory statement. (*Id.* at p. 1843.) In addition, the Rottweilers' vicious propensities in *Donchin,* unlike in this case, were on regular display for all to see in the front yard of the home. Here, on the other hand, there is no evidence that Kemo was kept in front of the house or that he displayed the same or similar sorts of aggressive behaviors that were present in the *Donchin* case. While it may have been reasonable for Dr. Polsky to infer in *Donchin* that the landlord must have seen the Rottweilers' vicious propensities when he regularly visited the property, due to the very different facts of this case, it was entirely speculative for Dr. Polsky to infer that Collins must have seen Kemo's vicious propensities when he visited the property.

■ Dr. Polsky's statement that adult male pit bulls "are often unpredictable in nature and frequently possess an inherent propensity for aggressive responding towards unfamiliar people who come near their territory" has no possible relevance given the absence of any evidence that Collins knew or must have known that Kemo was an adult male pit bull. The question is not whether Collins should have known or should have determined that Kemo was an aggressive adult male pit bull, but whether Collins must have known or had actual knowledge of that fact. (*Uccello v. Laudenslayer, supra,* 44 Cal.App.3d at p. 507.) Moreover, just as it is improper to take judicial notice that all German shepherds are dangerous (*Lundy v. California Realty* (1985) 170 Cal.App.3d 813, 822 [216 Cal.Rptr. 575]), it would be improper to take judicial notice that all adult male pit bulls are dangerous.

Dr. Polsky's statement that "[t]he attack by Kemo on Brian Yuzon was so persistent and vicious in nature that it is inconceivable that this was a first-time display of territorial aggression by this dog" is of no assistance to plaintiff because it failed to shed any light on what Collins knew or must have known about Kemo's vicious propensities.

■ Given that Dr. Polsky's declaration failed to create a triable issue of material fact regarding what Collins knew or must have known about Kemo's vicious propensities, plaintiff was not entitled to reconsideration of the summary judgment ruling.

## DISPOSITION

We affirm the summary judgment for defendant Collins, who is awarded his costs on appeal.

Spencer, P. J., and Vogel (Miriam A.), J., concurred.