Filed 3/11/13  Winston v. Countrywide Financial CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| MICHAEL WINSTON,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>COUNTRYWIDE FINANCIAL CORPORATION et al.,<br><br>Defendants and Appellants. | B232823<br><br>(Los Angeles County<br>Super. Ct. No. LC085895)<br><br>ORDER MODIFYING OPINION AND DENYING REHEARING (NO CHANGE IN JUDGMENT) |

THE COURT:

It is ordered that the opinion filed herein on February 19, 2013 be modified as follows:

1.      At the top of page 6, the sentence beginning "Dick Sambol, Countrywide's then-president," delete the name "Dick" and replace it with "David" so that the sentence reads:

David Sambol, Countrywide's then-president, asked Winston to report directly to him on the project (because Moody's "can shut us down").

2.      On page 16, all of footnote 14, beginning "Winston's reliance on *Donchin*" is deleted and the following footnote is inserted in its place:

[14]      Winston's reliance on our decision in *Donchin v. Guerrero* (1995) 34 Cal.App.4th 1832 is misplaced.  In *Donchin,* a premises liability action, the plaintiff alleged a landlord had actual knowledge of the vicious nature of a

tenant's dogs and was responsible for her injuries after the dogs had attacked her. (*Id.* at pp. 1835-1837.)  The landlord initially denied any knowledge the tenant had dogs, a statement he later admitted was false.  (*Id*. at p. 1835.)  In a sworn declaration submitted in support of his motion for summary judgment, he stated he knew about the dogs but lacked any knowledge of their violent propensities. (*Ibid.*)  We reversed the trial court's order granting summary judgment in favor of the landlord, explaining, first, a jury reasonably could infer from the landlord's earlier false exculpatory statement denying knowledge of the dogs' existence that his later statement denying knowledge of their violent propensities was likewise false (*id.* at pp. 1840-1843); and second, "[t]he inference [the landlord's] denial of knowledge should be disbelieved is bolstered further by some of the affirmative evidence [plaintiff] offered suggesting the landlord indeed possessed, or must have possessed, knowledge about the rottweilers' propensities."  (*Id.* at p. 1843.)  Based on the entire record before the trial court on the summary judgment motion—that is, both a reasonable basis for disbelieving the landlord's testimony and affirmative evidence that he must have known the dogs were vicious—we concluded the evidence would support a jury verdict in favor of the plaintiff and, therefore, granting summary judgment was improper.  (*Id.* at p. 1845.)

Nothing in *Donchin's* holding or analysis supports Winston's argument the jury here was entitled to infer Goren had disparaged Winston to Fishel simply because it disbelieved Fishel's testimony.  Moreover, unlike the landlord in *Donchin,* Fishel never recanted his testimony or made a demonstrably false exculpatory statement that could justify a secondary inference his stated reasons for not hiring Winston were pretextual.  Absent conclusive evidence of such a falsehood, the inference he gave pretextual reasons for the decision not to hire Winston was unduly speculative and does not constitute substantial evidence in support of the jury's verdict. (See *Donchin v. Guerrero, supra*, 34 Cal.App.4th at p. 1839.)

There is no change in the judgment.  Respondent's petition for rehearing is denied.

_____
   PERLUSS, P. J.           WOODS, J.           JACKSON, J.

Filed 2/19/13  Winston v. Countrywide Financial CA2/7 (unmodified version)
## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN


| | |
|---|---|
| MICHAEL WINSTON,<br><br>　　　Plaintiff and Respondent,<br><br>　　　v.<br><br>COUNTRYWIDE FINANCIAL<br>CORPORATION et al.,<br><br>　　　Defendants and Appellants. | B232823<br><br>(Los Angeles County<br>Super. Ct. No. LC085895) |


　　　APPEAL from a judgment of the Superior Court of Los Angeles County, Bert Glennon, Jr., Judge.  Reversed.

　　　Davis Wright Tremaine, Henry J. Tashman, John P. LeCrone and Camilo Echavarria for Defendants and Appellants Countrywide Financial Corporation and Bank of America Corporation.

　　　The Mathews Law Group, Charles T. Mathews; Pine & Pine, Norman Pine, Beverly Tillett Pine and Janet R. Gusdorff for Plaintiff and Respondent.

_____

Michael Winston, a human resources executive with nearly 30 years of experience in his field, sued Countrywide Financial Corporation, his former employer, and its successor, Bank of America Corporation, for wrongful termination and fraud after Bank of America acquired Countrywide in 2008 and declined to offer him continued employment. Winston alleged Countrywide had disparaged him to the Bank of America executive charged with determining which Countrywide human resources employees should be offered new positions with Bank of America in retaliation for actions he took in 2006. A jury agreed Winston had been wrongfully terminated and awarded him more than $3 million for lost wages. The trial court denied Countrywide and Bank of America's motion for judgment notwithstanding the verdict.

We reverse. Although a jury verdict is entitled to broad deference, Winston's evidence was insufficient to establish Bank of America declined to offer him a job based on impermissible motives.

## FACTUAL AND PROCEDURAL BACKGROUND

1. *The Evidence at Trial*

   a. *Winston's hiring by Countrywide*

Winston, who had previously worked at several Fortune 500 companies including Lockheed Martin, McDonnell Douglas, Motorola and Merrill Lynch, was hired by Countrywide's director of human resources, Leora Goren, in April 2005 to assist Countrywide in executive leadership development and succession planning. Countrywide had experienced rapid growth in the previous decade, and Goren advised Winston the company needed to develop more robust leadership systems to support that growth. Winston relocated from northern California based on Countrywide's bright future, in part as portrayed by Goren.

Winston performed well at Countrywide and was promoted by Goren during the next year.[1] In June 2006 Winston's team launched an executive leadership development

---

[1]    Notwithstanding these promotions, Goren identified several weaknesses in Winston's performance in his December 2005 annual review. According to Goren,

program aimed at "the top brass of the company." Angelo Mozilo, chairman of the board and chief executive officer of Countrywide, attended the first of the planned six-part program modules and complimented Winston on the event, indicating the program was exactly what Countrywide needed. A national human resources publication recognized the new program implemented by Winston as the 15th best in the nation among companies with more than 2,000 employees.

On July 17, 2006 Goren announced a restructuring of the human resources division that transferred responsibility for non-executive employee training to Josh Klarin, a newly hired human resources executive.[2] Although the number of employees reporting directly to Winston was reduced, he remained in charge of executive leadership development and was named a managing director of the company with the title of enterprise chief leadership officer.

b. *Winston experiences retaliation by Goren and other Countrywide executives*

According to Winston, the first incident that led to a pattern of retaliation against him occurred on July 26, 2006, shortly after Goren's announcement of the restructuring. The building housing Winston's team was undergoing renovation; and, in Winston's words, "I first heard a sound like a low humming sound . . . and before I even could look up, I felt like vapor droplets hitting my head. . . . [Immediately] I felt unbelievably dizzy, unbelievably nauseated, pounding headache, shortness of breath. . . . I [saw] pinkish, orange droplets coming down." Winston's assistant, who was with him in his office,

_____

"Michael is exceptionally articulate and thoroughly knowledgeable in his field." "There are occasions when he could be more concise in his communications and it is imperative that he be more judicious in sharing certain thoughts with and making certain comments in front of more junior employees in his organization. Additionally, . . . Michael occasionally responds emotionally when faced with challenges. A calmer reaction is generally more effective."

[2] Emails and memoranda between Winston and members of his team demonstrate the restructuring spawned a turf war between Klarin's and Winston's groups as duties and reporting lines shifted. Winston's own notes reveal significant frustration over his perception his work was not properly appreciated or compensated.

testified she saw "a fog" and felt like her lungs had been "seared." Approximately 10 other employees reported discomfort or burning in their lungs, a metallic taste in their mouths and headaches. The effects were limited to the area near Winston's office.

Winston reported the incident to Countrywide's safety office, which initiated an investigation. As part of the safety manager's response to the incident, company nurses contacted employees in the affected area and offered medical assistance if needed. Testing performed throughout the building, however, failed to identify the source of the discharge.[3]

Immediately after the event Winston contacted Goren, who was out of the office on vacation, and thereafter made "daily" efforts to get Countrywide "to do something about it." Expecting Goren's appreciation for his diligent response, Winston was surprised when she appeared angry at him upon her return. When he questioned her decision to announce to employees that testing had shown no danger, she acknowledged the testing had not yet been completed but told him she was trying to prevent panic among employees.[4] After the testing had been completed, Winston continued to advocate for further answers and asked the company to report the incident to the California Division of Occupational Safety and Health (Cal-OSHA). On August 7, 2006, having heard no response to his request, he personally reported the incident to Cal-OSHA.[5]

---

[3]  Countrywide hired two outside companies to test air quality in the building. Neither was able to identify any harmful substance.

[4]  Initial test results were reported to Goren on August 2, 2006, shortly after her return to the office.

[5]  Kimberley Jimenez-Pennington, the Countrywide employee responsible for investigating any notifications received by Cal-OSHA, testified Countrywide received a letter from Cal-OSHA around this time relating to the failure to secure plastic sheeting intended to isolate areas under renovation. A copy of the notification was posted for employee review, and she conducted an inspection to ensure administrative and engineering controls remained in place. She received no other complaints from Cal-OSHA and did not understand the single complaint received to relate to the discharge in Winston's office.

4

Winston testified that, immediately following his complaint to Cal-OSHA, many of his programs were cancelled or put on hold.[6]  In his words, he experienced "death by a thousand cuts" in a retaliation campaign he attributed to Goren.  Two employees in his group noted the hostile atmosphere and also identified Goren as the source.  Several weeks after the incident, while Winston was away on a business trip, Klarin, to whom several of Winston's reporting employees had been transferred, held a meeting in Winston's office with the remaining members of Winston's staff and told them Winston would not be returning and all executive leadership programs had been placed on hold.  Upon Winston's return Goren would not answer questions about the meeting, but Winston was not terminated.

At Winston's request he met with Goren on September 13, 2006 to discuss his position at Countrywide.  He informed Goren he believed he was being retaliated against through the removal of his responsibilities and employees because of his report to Cal-OSHA and advised her he had consulted with an attorney.  Goren referred his complaint to Countrywide's legal department and requested an investigation.[7]

Winston testified the retaliation against him personally increased in December 2006 as a result of his work in response to an audit by Moody's Investors Services, Inc. (Moody's), a rating agency that evaluates the quality of securities issued by a company.  Among other consequences, a poor rating by Moody's can dramatically affect the availability and cost to a company of operating capital, a critical component of Countrywide's business as a lender.  In particular, Moody's requested information relating to the strength of Countrywide's succession planning, an area of review prompted by the sudden departure in May 2005 of Countrywide's president and chief operating officer Stan Kurland (who had been Mozilo's anticipated successor) and the

---

[6]    August 2006 also brought the first signs of financial trouble for Countrywide.  A 10 percent budget cut, coupled with a hiring freeze, were ordered across the entire company, including the human resources division.

[7]    The legal department conducted an investigation, but the record does not reveal what, if any, action resulted.

company's delay of several months in replacing him. Goren asked Winston to prepare a response to Moody's on this question. To assist him in preparing a competent response, Winston asked Goren for information about Countrywide's previous succession plans, but Goren did not provide it. Dick Sambol, Countrywide's then-president, asked Winston to report directly to him on the project (because Moody's "can shut us down"). When Winston's report offered no explanation for the gap between Kurland's departure and Sambol's appointment, Sambol asked Winston to "cooperate" on the proposed explanation to Moody's to, as Winston believed, obscure the actual length of time the position had been unfilled. Winston replied, "I think I understand what you want me to do . . . . I am not your guy."

According to Winston, the consequences were swift and harsh. In an email dated January 24, 2007 (about six weeks after the conversation) Mozilo wrote to Goren and Sambol demanding Winston's immediate termination. Mozilo complained about Winston's "motivations and overall attitude and demeanor," citing Winston's personal website advertising himself as a motivator, entertainer and networker: "He cannot serve two masters." Goren objected to Mozilo's directive, stating it would not be in the company's best interest and praised Winston as "an extremely talented, albeit eccentric, individual" and "an expert in the Leadership field." She suggested any negative comments about Winston had come from the outside consultant who had previously performed Winston's functions for Countrywide and disputed the notion his speaking activities were incompatible with his work for the company. Sambol joined in this recommendation and told Mozilo they would "continue monitoring his performance and periodically revisit the issue." Mozilo reluctantly accepted this recommendation but noted "[e]ccentric people are by definition not team players" and Winston could be replaced by someone who was "talented" but also "proud to be on our team rather than feel superior to the team."

Notwithstanding the retaliation against Winston personally, his team rolled out the second and third modules of the executive leadership development program in September and December 2006 and the third, fourth and fifth modules in the spring and summer of

2007. One of the key members of Winston's team testified support within the company's leadership for the executive development initiatives actually improved during 2007. The team also developed a new model for succession planning within executive leadership. Based largely on Winston's initiatives, Countrywide's executive development program was named eighth best in the nation in 2007 by the same industry publication, having improved from the previous year's showing of 15th. Winston testified, however, his team continued to be dismantled, and Sambol refused to acknowledge him. He was also forced to relocate his office seven times and was not invited to critical executive meetings.

        c. *Bank of America decides to acquire Countrywide but declines to offer Winston a post-acquisition position*

By the fall of 2007, the mortgage industry was imploding. The sixth and final module of the executive leadership program, which had been scheduled for fall 2007, was cancelled when Countrywide's business plummeted and the company announced yet another round of cutbacks and layoffs.[8] In January 2008 Bank of America, which had invested $2 billion in Countrywide in August 2007, announced plans to acquire Countrywide. By that time, Winston was managing only two employees.

As part of Bank of America's acquisition of Countrywide, it initiated a transition process to evaluate which programs and personnel to retain. Each Countrywide employee was directed to complete a talent profile recounting the employee's work history, education and skills. Although a form was completed for Winston, he testified he never saw it and noted errors he said he never would have made.[9] Goren, who was

---

[8]    Between August 2006, when Countrywide initiated company-wide budget cuts of 10 percent, and December 31, 2007 Countrywide laid off 12,000-plus employees, more than one-third of its work force.

[9]    Winston claimed the form omitted mention of his rapid promotion at Lockheed two decades earlier and his brief tenure at NVidia, a software company that had employed him for several months immediately before Countrywide hired him. He also noted several inaccurate dates, including the date he received his doctoral degree. Winston provided no information, however, as to who else might have completed the

never considered for employment at Bank of America, was also asked to evaluate the strengths and weaknesses of the employees who reported directly to her, including Winston, whom she supposedly ranked last. No witness was able to authenticate the document containing this ranking, however; and it was not admitted at trial.

Brian Fishel, senior vice president of enterprise executive development for Bank of America, was assigned the task of evaluating Countrywide's leadership and performance management group (headed by Winston) and its training group (headed by Klarin) for employment by Bank of America. Fishel, who had seen Winston's talent profile but had not seen or been informed of Goren's rankings, interviewed members of the two groups, including Winston, in June 2008. Before the interviews began, Fishel met with Goren for 15 to 20 minutes. Fishel acknowledged he had spoken with Goren about Winston and Klarin but denied she had said anything negative about Winston or mentioned either of the two events Winston claimed led to retaliation against him.[10] Specifically, Fishel stated he had no knowledge of the July 2006 chemical release in Winston's office or Winston's subsequent complaint to Cal-OSHA or that Countrywide had been required to respond to Moody's in December 2006. According to Fishel, he alone made the decision not to offer Winston a position at Bank of America.

In fact, of the 14 employees interviewed, Fishel chose to hire only three lower-level employees. None of the six managing directors who reported to Goren was offered a position with Bank of America, including Winston and Klarin. Explaining his decision not to hire Winston, Fishel testified his own position at Bank of America was equivalent to Winston's at Countrywide and the bank was not looking to replace or modify its existing executive development programs, its succession plans or other human resources

---

form. Other employees with knowledge of the process testified the form was supposed to have been completed by Winston but also could have been completed by his assistant.

[10] At trial, neither Goren nor Samuels was asked questions about Fishel's decision not to hire Winston. The other Countrywide senior executives who testified at trial—Mozilo, Sambol and Andrew Gissinger—insisted they had not spoken with anyone at Bank of America about Winston. Indeed, Mozilo left the company in February 2008, long before the decision was made.

functions within Winston's areas of expertise. Moreover, Winston's base salary at Countrywide in 2007 exceeded that of Fishel's. Fishel also testified he found Winston to be arrogant during the interview and did not believe he would fit well with Bank of America's corporate culture.

Winston's account of the interview differed markedly. According to Winston, Fishel first tried to get Winston to divulge the secrets of his success. Within minutes, however, Fishel told Winston, "I know how it feels to be acquired and not have a job after that. . . . Don't worry. You'll bounce back." Winston testified he was astonished Fishel failed to identify any possible positions he might be able to fill at Bank of America.

Winston received his official notice of severance, conditioned on finalization of Countrywide's acquisition by Bank of America, on June 30, 2008. The letter advised, "If the merger is not consummated, this notice will have no effect." The acquisition was concluded in July 2008, and Winston received a severance package valued at $877,086.23. Although Winston testified he had made "Herculean" efforts to find another job following his termination, he was unable to do so.

2. *The Jury's Verdict and Posttrial Motions*

The jury rejected Winston's claims of fraud in his hiring but found he had been wrongfully terminated. It awarded $3,828,166 in past and future economic damages, but nothing for past and future emotional distress. The jury also rejected Winston's request for punitive damages. Judgment was entered on February 24, 2011.

Countrywide and Bank of America moved for judgment notwithstanding the verdict based on Winston's failure to establish Bank of America's decision not to hire him was based on an improper, retaliatory motive. Without answering this contention explicitly, the trial court denied the motion, reasoning the jury had shown careful consideration of the factual issues in its verdicts and had before it ample evidence on a variety of subjects relating to the decision not to hire Winston.

9

**DISCUSSION**

1. *Governing Law and Standard of Review*

The cause of action for wrongful termination in violation of public policy is an exception to the general rule that an employer has an unfettered right to terminate an at-will employee: Although an employer has the right to terminate at-will employees for any or no reason, even an arbitrary or irrational reason, the employer does not have the right to terminate an employee in violation of a substantial and fundamental public policy. (*Guz v. Bechtel National Inc.* (2000) 24 Cal.4th 317, 335; see also *Stevenson v. Superior Court* (1997) 16 Cal.4th 880, 889-890; *Tameny v. Atlantic Richfield Co.* (1980) 27 Cal.3d 167, 169-170.) To support a claim for wrongful termination in violation of public policy, the policy allegedly violated must be articulated, at the time of the discharge, in a constitutional or statutory provision. (*Stevenson,* at pp. 889-890; see *Green v. Ralee Engineering Co.* (1998) 19 Cal.4th 66, 76.)

To prevail on a cause of action for wrongful termination resulting from retaliation, whether under the Fair Employment and Housing Act (Gov. Code, § 12900 et seq.) or other statutory authority, a plaintiff must show (1) he or she engaged in protected activity; (2) the employer discharged the employee; and (3) a causal link existed between the protected activity and the discharge—for instance, the employer harbored a retaliatory motive against the employee that led to the discharge. (See *Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1042; *Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 287-288; *Guthrey v. State of California* (1998) 63 Cal.App.4th 1108, 1125.) "'The retaliatory motive is "proved by showing that plaintiff engaged in protected activities, that his employer was aware of the protected activities, and that the adverse action followed within a relatively short time thereafter." [Citation.] "The causal link may be established by an inference derived from circumstantial evidence, 'such as the employer's knowledge that the [employee] engaged in protected activities and the proximity in time between the protected action and allegedly retaliatory employment decision.'" [Citation.]' [Citation.] 'Essential to a causal link is evidence that the

10

employer was aware that the plaintiff had engaged in the protected activity.'" (*Morgan v. Regents of University of California* (2000) 88 Cal.App.4th 52, 69-70.)

Proof of intentional discrimination or retaliation often depends on circumstantial evidence because it consists of "subjective matters only the employer can directly know, i.e., his attitude toward the plaintiff and his reasons for taking a particular adverse action." (*Mamou v. Trendwest Resorts, Inc.* (2008) 165 Cal.App.4th 686, 713 (*Mamou*); accord, *Joaquin v. City of Los Angeles* (2012) 202 Cal.App.4th 1207, 1219 (*Joaquin*).) As *Joaquin* explains, "Given the resulting difficulties of proof, the courts have fashioned a special presumption shifting the burden of production—but not persuasion—to the employer upon a prescribed showing by the plaintiff. Specifically, 'the employee "may raise a presumption of discrimination by presenting a 'prima facie case,' the components of which vary with the nature of the claim, but typically require evidence that '(1) [the plaintiff] was a member of a protected class [or engaged in a protected activity], (2) he was qualified for the position he sought or was performing competently in the position he held, (3) he suffered an adverse employment action, such as termination, demotion, or denial of an available job, and (4) some other circumstance suggests discriminatory [or retaliatory] motive. [Citations.]' A satisfactory showing to this effect gives rise to a presumption of discrimination which, if unanswered by the employer, is mandatory—it requires judgment for the plaintiff.""" (*Joaquin,* at p. 1220, quoting *Mamou,* at pp. 713-714; see also *Morgan v. Regents of University of California, supra,* 88 Cal.App.4th at p. 68.)

Once the employee makes the required showing, to avoid an adverse judgment the employer must then produce evidence to rebut the presumption of discrimination or retaliation: "Once an employee establishes a prima facie case [of retaliation], the employer is required to offer a legitimate, nonretaliatory reason for the adverse employment action. [Citation.] If the employer produces a legitimate reason for the adverse employment action, the presumption of retaliation ""'drops out of the picture,'"" and the burden shifts back to the employee to prove intentional retaliation." (*Yanowitz v. L'Oreal USA, Inc., supra,* 36 Cal.4th at p. 1042; accord, *Joaquin, supra,* 202 Cal.App.4th

11

at p. 1220; *McRae v. Dept. of Corrections and Rehabilitation* (2006) 142 Cal.App.4th 377, 388-389 (*McRae*).) "'The ultimate question is whether the employer intentionally discriminated, and proof that "the employer's proffered reason is unpersuasive, or even obviously contrived, does not necessarily establish that the plaintiff's proffered reason . . . is correct.' [Citation.] In other words, "[i]t is not enough . . . to disbelieve the employer; the factfinder must believe the plaintiff's explanation of intentional discrimination." [Citation.]'" (*Frank v. County of Los Angeles* (2007) 149 Cal.App.4th 805, 824, quoting *Reeves v. Sanderson Plumbing Products, Inc.* (2000) 530 U.S. 133, 146-147 [120 S.Ct. 2097, 147 L.Ed.2d 105].) "The central issue is and should remain whether the evidence as a whole supports a reasoned inference that the challenged action was the product of discriminatory or retaliatory animus." (*Mamou, supra,* 165 Cal.App.4th at p. 715; accord *Joaquin, supra,* 202 Cal.App.4th at p. 1226, fn. 5.)

The jury found Bank of America's 2008 decision not to hire Winston, which resulted in his termination by Countrywide, was motivated by retaliation for his June 2006 complaint to Cal-OSHA and his December 2006 refusal to make any misleading statements in the report to Moody's.[11] The sole issue in this appeal is whether the jury's verdict was supported by substantial evidence. Defendants contend Bank of America had legitimate reasons not to offer employment to Winston and these reasons were not pretextual. Indeed, Countrywide and Bank of America argue Winston failed to prove Bank of America even knew of the 2006 episodes he claims motivated its decision not to hire him.

Countrywide and Bank of America bear a heavy burden in this court: "[T]he reviewing court must start with the presumption that the record contains evidence sufficient to support the judgment; it is appellant's burden to demonstrate otherwise." (*Baxter Healthcare Corp. v. Denton* (2004) 120 Cal.App.4th 333, 368.) "'Actions for unlawful discrimination and retaliation are inherently fact-driven, and we recognize that

---

[11]     The parties do not dispute this conduct constituted protected activity for purposes of Winston's wrongful termination claim.

12

it is the jury, and not the appellate court, that is charged with the obligation of determining the facts.  Nonetheless, the jury's verdict stands only if it is supported by substantial evidence.  "In determining whether a judgment is supported by substantial evidence, we may not confine our consideration to isolated bits of evidence, but must view the whole record in a light most favorable to the judgment, resolving all evidentiary conflicts and drawing all reasonable inferences in favor of the decision of the trial court. [Citation.]  We may not substitute our view of the correct findings for those of the trial court [or jury]; rather, we must accept any reasonable interpretation of the evidence which supports the [factfinder's] decision.  However, we may not defer to that decision entirely.  '[I]f the word "substantial" means anything at all, it clearly implies that such evidence must be of ponderable legal significance.  Obviously the word cannot be deemed synonymous with "any" evidence.  It must be reasonable in nature, credible, and of solid value; it must actually be "substantial" proof of the essentials which the law requires in a particular case.'" (*Joaquin, supra,* 202 Cal.App.4th at pp. 1218-1219, quoting *Beck Development Co. v. Southern Pacific Transportation Co.* (1996) 44 Cal.App.4th 1160, 1203, 1204; accord, *McRae, supra,* 142 Cal.App.4th at pp. 389-390.)

"""[A] judgment may be supported by inference, but the inference must be a reasonable conclusion from the evidence and cannot be based upon suspicion, imagination, speculation, surmise, conjecture or guesswork.  [Citation.]  Thus, an inference cannot stand if it is unreasonable when viewed in light of the whole record. [Citation.]  And although an appellate court will normally defer to the trier of fact's drawing of inferences, it has been said:  'To these well settled rules there is a common sense limited exception which is aimed at preventing the trier of the facts from running away with the case.  This limited exception is that the trier of the facts may not indulge in the inference when that inference is rebutted by clear, positive and uncontradicted evidence of such a nature that it is not subject to doubt in the minds of reasonable men. The trier of the facts may not believe impossibilities.'""" (*Joaquin, supra,*

13

202 Cal.App.4th at p. 1219; accord, *McRae, supra,* 142 Cal.App.4th at p. 390; *Frank v. County of Los Angeles*, *supra*, 149 Cal.App.4th at pp. 816-817.)

> 2. *There Was Insufficient Evidence for the Required Showing Bank of America's Decision Not To Hire Winston Was Based on an Impermissible Retaliatory Motive*

The linchpin of Winston's claim was the assertion Bank of America knew about his protected activity in reporting a safety violation to Cal-OSHA and in refusing Sambol's request he alter the Moody's report to misrepresent the timing of Sambol's appointment as Countrywide's president. There is no evidence, either documentary or testimonial, linking Bank of America's decision not to hire Winston to either of these events.

The decision not to hire Winston was made on behalf of Bank of America by Fishel. That Fishel's stated reasons for not hiring Winston were legitimate and non-retaliatory is indisputable. According to Fishel, Bank of America had no open position for an executive employee with Winston's expertise because Fishel himself held the equivalent position at Bank of America. No evidence contradicts this testimony by Fishel. Winston's attempt to discredit Fishel's testimony with a 2007 job announcement he claims demonstrated Bank of America had recruited him possibly to replace Fishel and his assertion his skills and experience exceeded Fishel's are irrelevant. Fishel was Bank of America's leadership development executive, and Bank of America was not required to displace him to make room for Winston. Further, the fact Winston's salary at Countrywide exceeded Fishel's Bank of America salary corroborates Fishel's conclusion the bank's interests would not be served by hiring Winston. Finally, albeit subjective in nature and thus possibly insufficient standing alone to constitute a legitimate, non-retaliatory reason for an adverse job action, Fishel's impression that Winston was personally arrogant—a perception that comported with the testimony of other Countrywide employees—is a permissible reason for an employer not to hire a prospective employee.

14

To counter the facial legitimacy of Fishel's stated reasons, Winston asserts Fishel's decision not to offer him a position resulted from Goren's negative attitude about Winston, which she conveyed either during the meeting she had with Fishel shortly before their interview or through a memorandum she allegedly prepared ranking Winston last of her directly reporting employees.[12] Fishel, however, denied Goren made any negative comments about Winston during that meeting and testified he never spoke with any other Countrywide executive about Winston, including Mozilo, who had left Countrywide several months earlier in February 2008. Fishel, in fact, denied any knowledge of the 2006 events Winston claims formed the basis of the retaliation against him, and Winston has not presented any evidence to the contrary.[13]

Absent evidence Goren's perceived antipathy toward him was actually communicated in some manner to Fishel, Winston may not infer it must have occurred from the mere opportunity afforded by Goren's meeting with Fishel. Winston argues the jury clearly disbelieved Fishel, the only person who was questioned about the conversation. Disbelief of this testimony, however, does not constitute affirmative evidence of the contrary proposition. (See *California Shoppers, Inc. v. Royal Globe Ins. Co.* (1985) 175 Cal.App.3d 1, 48 ["[i]f a witness testifies, for instance, that *it was not*

---

[12] As discussed, the memorandum in which Goren ranked her employees was not admitted into evidence; and Goren was not asked any questions about it. We are, therefore, precluded from considering it on appeal. (See *Frank v. County of Los Angeles, supra,* 149 Cal.App.4th at p. 815 ["[i]t is axiomatic that in reviewing the liability aspect of a judgment based on a jury verdict, we may not review exhibits identified, but not admitted at trial"]; *USLIFE Savings & Loan Assn. v. National Surety Corp.* (1981) 115 Cal.App.3d 336, 343 [facts, events, documents or other matters urged by party not admitted into evidence cannot be included in the record on appeal and are outside scope of review].)

[13] Winston's assertion he told Fishel during the interview he had experienced retaliation by Countrywide is not supported by the record. The testimony he cites, a single reference to this rather remarkable proposition, is ambiguous at best. In fact, it appears the conversation referred to was with the expert witness who testified on the subject of damages, not Fishel. We have considered the other inferences advocated by Winston and find them equally speculative.

15

*raining* at the time of the collision, and if the jury disbelieves that testimony, such disbelief does not provide evidence that it *was raining* at the time of the collision"]; *Hicks v. Reis* (1943) 21 Cal.2d 654, 660 [if the finder of fact refuses to give credence to a witness's testimony, the testimony "'is of no more effect than if it had not been given. It disappears from the case . . .'"].) As Judge Learned Hand explained more than a half-century ago, "It is true that the carriage, behavior, bearing, manner and appearance of a witness—in short, his 'demeanor'—is part of the evidence. The words used are by no means all that we rely on in making up our minds about the truth of a question that arises in our ordinary affairs, and it is abundantly settled that a jury is as little confined to them as we are. . . . [fn. omitted.] [S]uch evidence may satisfy the tribunal, not only that the witness' testimony is not true, but that the truth is the opposite of his story; for the denial of one, who has a motive to deny, may be uttered with such hesitation, discomfort, arrogance or defiance, as to give assurance that he is fabricating, and that, if he is, there is no alternative but to assume the truth of what he denies. [¶] Nevertheless, although it is therefore true that in strict theory a party having the affirmative might succeed in convincing a jury of the truth of his allegations in spite of the fact that all the witnesses denied them, we think it plain that such a verdict would nevertheless have to be directed against him. This is owing to the fact that otherwise in such cases there could not be an effective appeal. . . . He, who has seen and heard the 'demeanor' evidence, may have been right or wrong in thinking that it gave rational support to a verdict; yet, since that evidence has disappeared, it will be impossible for an appellate court to say which he was." (*Dyer v. MacDougall* (2d Cir. 1952) 201 F.2d 265, 267-268 (Hand., L., J.); accord, *Viner v. Sweet* (2004) 117 Cal.App.4th 1218, 1229-1230.)[14]

---

14    Winston's reliance on *Donchin v. Guerrero* (1995) 34 Cal.App.4th 1832, in which a landlord was charged with actual knowledge of the vicious nature of a tenant's dogs, is misplaced. In reversing summary judgment in favor of the landlord, the court relied in part on the landlord's false denials of his knowledge when initially informed of the lawsuit, which the court concluded could constitute evidence of consciousness of liability, especially in light of the broad agreement of other witnesses the dogs were consistently aggressive and threatening. Winston argues the jury here was entitled to

Winston alternatively argues we should apply what is known as the "cat's paw" doctrine, which recognizes the improper motive of a non-decisionmaker may be imputed to the decisionmaker in certain circumstances. (See, e.g., *Staub v. Proctor Hospital* (2011) ___ U.S. ___ (Mar. 1, 2011, No. 09-400) [131 S.Ct. 1186, 179 L.Ed.2d 144].) In *Staub* the United States Supreme Court held the plaintiff had proven employment discrimination on the "cat's paw" theory by producing evidence that his supervisors' actions "were motivated by hostility toward [his] military obligations" and "were causal factors underlying [the] decision to fire [him]." (*Id.* at p. 1194; see also *Poland v. Chertoff* (9th Cir. 2007) 494 F.3d 1174, 1182 ["if a subordinate, in response to a plaintiff's protected activity, sets in motion a proceeding by an independent decisionmaker that leads to an adverse employment action, the subordinate's bias is imputed to the employer if the plaintiff can prove that the allegedly independent adverse employment decision was not actually independent because the biased subordinate influenced or was involved in the decision or decisionmaking process"].) Unlike *Poland*, however, Winston has failed to show how Goren affected Fishel's decision either directly or indirectly. Bank of America's acquisition of Countrywide, and its ensuing selection of some, but by no means all, Countrywide employees for retention, cannot be traced to Goren's antipathy toward Winston.

Instead, this case is similar to the Ninth Circuit's decision in *Cafasso v. General Dynamics C4 Systems, Inc.* (9th Cir. 2011) 637 F.3d 1047, in which the court rejected the plaintiff's "cats paw" theory. As the court explained, the employer justified its termination of the plaintiff as part of a corporate reorganization unrelated to her protected

infer Goren had disparaged Winston to Fishel because it found Fishel's testimony false. However, there is no basis for such an inference. Unlike the landlord in *Donchin,* Fishel never recanted his testimony or made a demonstrably false exculpatory statement. Indeed, *Donchin* correctly states the applicable rule in this scenario: "[A]ctual knowledge can be inferred from the circumstances only if, in light of the evidence, such inference is not based on speculation or conjecture. . . . [O]nly where the circumstances are such that the defendant 'must have known' and not 'should have known' will an inference of actual knowledge be permitted." (*Id.* at p. 1839.)

17

inquiries; and the official who terminated the plaintiff testified he did not know about her inquiries when he made the reorganization decision. (*Id.* at p. 1060.) The plaintiff failed to produce any contrary evidence and admitted in her deposition she had no reason to disbelieve his account. (*Ibid.*) To have established liability on the part of the employer, the plaintiff would have had to show "that one of [the decisionmaker's] subordinates, in response to [the plaintiff's] protected activity, 'set[] in motion' [the] decision to eliminate [her] department and job, and that the subordinate 'influenced or was involved in the decision or decisionmaking process.'" (*Id.* at p. 1061.) Because the plaintiff failed to "set forth non-speculative evidence of specific facts" this chain of events in fact occurred, the court concluded a finding of liability would require "undue speculation." (*Ibid.*)

The instant case is markedly similar to the situation in *Cafasso*. Bank of America's acquisition of Countrywide did not revolve around Winston or his colleagues in the human resources division. Bank of America (in a move it certainly came to regret) acquired Countrywide for its loan portfolio, not its subsidiary support functions. Bank of America was a far larger company with substantial existing institutional systems to support its operations. Within the small realm of Winston's and Klarin's groups, only three lower-level employees were hired by Bank of America to integrate into those existing systems. Moreover, Winston was hardly the only executive at his level not to be hired by Bank of America; to the contrary, Bank of America retained none of the top executives in Winston's chain of command and none of the managing directors who reported to Goren. Winston has not shown that the history of retaliation he experienced formed the basis for Bank of America's decision not to hire him.

In short, having scoured the record for evidence supporting the jury's verdict on the issue of causation, we have found none. It follows that the trial court erred in denying defendants' motion for judgment notwithstanding the verdict. (See, e.g., *Hauter v. Zogarts* (1975) 14 Cal.3d 104, 110 ["'A motion for judgment notwithstanding the verdict of a jury may properly be granted only if it appears from the evidence, viewed in the light most favorable to the party securing the verdict, that there is no substantial evidence to support the verdict. If there is any substantial evidence, or reasonable inferences to be

18

drawn therefrom, in support of the verdict, the motion should be denied.'"]; *Henrioulle v. Marin Ventures, Inc.* (1978) 20 Cal.3d 512, 515 [appellate court in reviewing trial court's grant or denial of a motion for judgment notwithstanding the verdict uses same standard of review as employed by the trial court in deciding the motion].)[15]

## DISPOSITION

The judgment is reversed.  Countrywide and Bank of America are to recover their costs on appeal.


PERLUSS, P. J.


We concur:


WOODS, J.


JACKSON, J.

---

[15] We also reject Winston's contention Countrywide and Bank of America forfeited their sufficiency of the evidence argument by presenting only the facts and inferences favorable to their position.  (See, e.g., *Schmidlin v. City of Palo Alto* (2007) 157 Cal.App.4th 728, 738 ["[w]here a party presents only facts and inferences favorable to his or her position, 'the contention that the findings are not supported by substantial evidence may be deemed waived'"]; *Nwosu v. Uba* (2004) 122 Cal.App.4th 1229, 1247 [appellant's "recitation of facts fails to discuss all evidence material to his contentions. We therefore find . . . [he] has waived [claims of insufficiency of the evidence] on appeal"].)  The opening brief addressed all material facts relevant to the limited argument made by Countrywide and Bank of America on appeal.

19